IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DEANA WATSON, *as Independent Administrator of the Estate of* CLAUDE GARRETT*, deceased*, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 3:23-cv-00456 |
| | ) | JUDGE RICHARDSON |
| Current and/or Former Nashville Metropolitan Fire Department Marshalls KENNETH PORTER, OTIS JENKINS, and PATRICK HUNT, Current and/or Former Nashville Metropolitan Police Officers WILLIAM MICHAEL ROLAND, DAVID MILLER, and DESMOND CARTER, Current and/or Former ATF Agent JAMES COOPER, and THE UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) | MAGISTRATE JUDGE FRENSLEY |
| Defendants. | ) ) | |

**DEFENDANTS UNITED STATES' AND JAMES COOPER'S MEMORANDUM IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.01, Defendants United States of America

and former Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") Special Agent James

Cooper respectfully submit this Memorandum in Support of their Motion for Summary Judgment.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 3

FACTUAL BACKGROUND & PROCEDURAL HISTORY ........................................... 3

   A.   Facts Related to the 1992 Fire and Investigation ................................................. 3

   B.   Subsequent Legal History ..................................................................................... 6

   C.   Garrett's Release .................................................................................................. 7

   D.   Plaintiff Files This Lawsuit .................................................................................. 8

LAW & ARGUMENT .................................................................................................... 9

   I.   The Section 1983 Claims Cannot Survive Against Former SA James Cooper Because He is a Federal Actor. ............................................................................................ 10

   II.   Even if the Court Were to Construe Plaintiff's Section 1983 Claims Against SA Cooper as *Bivens* Claims, They Fail as a Matter of Law. ...................................... 12

   III.   Plaintiff Lacks Sufficient Proof for Any *Bivens* Claim. ............................... 17

      A.   The Defendants Conducted a Routine Investigation. .......................................... 17

      B.   Plaintiff's Case Is Founded Solely on Speculation, Conjecture and Fantasy, and Thus SA Cooper is Entitled to Summary Judgment. ....................................... 22

      C.   SA Cooper Has Absolute Immunity for His Trial Testimony in Both the 1993 and 2003 Trials. .................................................................................................... 24

   IV.   SA James Cooper Cannot be Sued for Intentional Infliction of Emotional Distress (Count VII) Under Tennessee State Law. ...................................................... 25

   V.   The Intentional Infliction of Emotional Distress Claim Against the United States (Count VI) Must Be Dismissed. ................................................................................ 26

      A.   The Statute of Limitations has Long Since Run ................................................. 26

      B.   Plaintiff Cannot Prove Critical Elements of IIED Under Tennessee Law ........... 29

         1.   Plaintiff Cannot Show That SA Cooper's Conduct was Intentional or Reckless. 29

         2.   SA Cooper's Conduct Was Not Outrageous. .................................................. 30

CONCLUSION .............................................................................................................. 31

## INTRODUCTION

After a series of unsuccessful direct appeals and collateral attacks on his conviction for arson and murder, Claude Garrett succeeded in securing his release from prison via the Nashville District Attorney's Office's Conviction Review Unit ("CRU") based exclusively on evolving fire science. This lawsuit alleges that the firefighters, police detectives, and an ATF agent involved in Garrett's arrest and prosecution conspired to deprive him of his constitutional rights. Plaintiff criticizes and second-guesses aspects of the investigation, but there is not a shred of evidence to support a conspiracy or cover-up. This is not a case where decades after a crime is committed DNA exonerates a defendant or where a new perpetrator emerges. In fact, there is **no proof** of Garrett's actual innocence – the CRU simply lost confidence in his conviction. The Director of the CRU testified as follows:

> Q: Okay. Can you conclusively say that Garrett is innocent of murder?
> **A: No. I am as capable of being wrong as any of the original investigators. I have to accept that as part of my job or I can't do my job, honestly.**
> Q: And so you're comfortable with him walking, knowing that he might not be innocent?
> **A: I would much rather someone who might remotely be guilty walk, who's already served, especially this type of sentence, then someone who is – that we are not sure is guilty, sitting in prison.**

Statement of Material Facts ("SOMF") ¶ 39. Plaintiff's quest for retribution is clear, but this entire case is speculation. Plaintiff needs more than conjecture to advance beyond the Rule 56 stage. Because there is no admissible evidence to support a theory that these officers lied, fabricated evidence, or conspired to convict Claude Garrett, Defendants are entitled to summary judgment and dismissal of this case with prejudice.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A. Facts Related to the 1992 Fire and Investigation

In the early morning of February 24, 1992, a fire broke out at the residence of Claude Garrett ("Garrett") and Lori Lance ("Lance") at 114 Broadway in Hermitage, Tennessee. SOMF ¶

1. The Nashville Metro Fire Department arrived and found Lori Lance in the utility room located in the rear of the home. Prior to the fire, the Nashville Police Department had issued an incident report with allegations of domestic violence by Lance against Garrett. SOMF ¶¶ 2, 15, 16. The night before the fire, Garrett had spent five or six hours drinking beer at a bar called Daisy Mae's and he smoked marijuana. SOMF ¶¶ 3, 60. Garrett told first responders who arrived on the scene that Lance was still in the house in the front bedroom. SOMF ¶ 4. Firefighters did not find anyone in the front of the house, and when firefighter Patrick Hunt came outside to change an air tank, Garrett said that Lance was in the back of the house. SOMF ¶ 5. While Nashville firefighter captain Oddis Jenkins was in the house fighting the fire and attempting to save Lance, he discovered the utility room door was locked, and it would not come open at first. SOMF ¶¶ 6. Jenkins "messed with" the door and eventually found her on the floor of the utility room laying parallel to the wall, with her head and upper body between a washing machine and the wall with items laying on top of her. SOMF ¶¶ 6, 7. Lance died. SOMF ¶¶ 1, 8.

Garrett sustained only minor injuries, including burns to his forehead and the back of his hand, and singed hair. SOMF ¶ 9. Nashville Fire Department fire / arson investigator Kenneth Porter arrived on the scene at 6:30am that morning, began his inspection, and noticed an unusual burn pattern suggesting to him a liquid accelerant. He also noticed a strong odor of kerosene and identified the fire's point of origin as the living room. He also observed an opaque, five-gallon plastic container on the kitchen floor next to the refrigerator and adjacent to the utility room door; the top of the container was partially melted and it contained kerosene. SOMF ¶ 10. Porter was a certified fire investigator and had experience in arson investigations. SOMF ¶ 11. Firefighters assisted Porter in removing debris from the living room floor, and used a hose to wash the area, revealing what appeared to Porter to be a large pour pattern. The top portion of the aluminum storm door was burned off, indicating a very hot and fast-burning fire. SOMF ¶ 12. Porter also collected samples to send to TBI. SOMF ¶¶ 10.

Detective David Miller arrived at 6:22am, and when he and Detective Mike Roland arrived on the scene, the fire captain told them the fire was of a suspicious nature. SOMF ¶ 13. Porter briefed Detectives Miller and Roland that the fire may have been intentionally set, and Detective Miller requested that Porter gather all needed physical evidence. SOMF ¶ 14. Detectives took an initial statement from Garrett, who appeared nervous and fidgety. SOMF ¶ 17. After learning from Porter that the fire might have been intentionally set, detectives obtained a warrant to search the house for evidence. SOMF ¶ 19.

Detective Miller requested ATF Special Agent James Cooper ("SA Cooper") come to the scene to assist in the collection of evidence. SOMF ¶ 21. On February 24, 1992, James Cooper was a Special Agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF"), and had assisted the Nashville Police Department with other arson investigations. SOMF ¶ 22. At 6:20pm the day of the fire, SA Cooper met Detectives Miller, Roland, and District Attorney's Office Investigator Regina West at the scene. SOMF ¶ 25. SA Cooper determined the origin of the fire was the living room and the investigators observed that the electrical box had no internal damage, and the kitchen stove burners were not burned out. SOMF ¶ 26. The group observed that a wet bedspread that smelled of accelerant was in front of the refrigerator and had been stuffed partially under it. SOMF ¶ 27. The group also observed that a clear plastic container was located between the refrigerator and the door to the utility room where Lance was found, and that it contained some kind of accelerant. *Id*. During the walk-through, Cooper recalled tripping over the bedspread. SOMF ¶ 28. SA Cooper examined the door of the utility room and observed that the inside of the door was clean, thus appearing that the door was in a closed position when the fire occurred. SOMF ¶ 29. The group sent the kerosene heater from the house to a professional consultant for testing. SOMF ¶ 34.

Detective Miller presented the case to the grand jury on May 19, 1992, and the grand jury returned a true bill for first degree murder charges against Claude Garrett on May 29, 1992. SOMF

5

¶ 35. Claude Garrett was convicted of arson and murder in 1993. SOMF ¶ 36. The Tennessee Court of Criminal Appeals ordered a new trial as a result of a *Brady* issue. *Garrett v. State*, No. M1999-00786-CCA-R3PC, 2001 WL 280145 (Tenn. Crim. App. Mar. 22, 2001) (post-conviction, remanding for new trial). Garrett was convicted again in 2003 in a second trial. SOMF ¶ 36. SA Cooper testified at both trials. SOMF ¶ 38. SA Cooper was retired by the second trial and was subpoenaed to testify. *Id*.

## B. Subsequent Legal History

Garrett's criminal case and its ensuing collateral review have produced numerous opinions over the years. *See, e.g.*, *Garrett v. State*, No. M201701076CCAR3ECN, 2018 WL 1976358 (Tenn. Crim. App. Apr. 26, 2018) (affirming denial of coram nobis); *Garrett v. State*, No. M2011-00333-CCA-R3PC, 2012 WL 3834898 (Tenn. Crim. App. Sept. 5, 2012) (affirming denial of post-conviction relief after second trial); *State v. Garrett*, No. M2004-02089-CCA-R3CD, 2005 WL 3262933 (Tenn. Crim. App. Dec. 1, 2005) (affirming conviction after second trial on direct appeal); *Garrett*, 2001 WL 280145 (Tenn. Crim. App. Mar. 22, 2001) (post-conviction, remanding for new trial); *Garrett v. State*, No. 01C01-9807-CR-00294, 1999 WL 436828 (Tenn. Crim. App. June 30, 1999) (remanding for more comprehensive findings on post-conviction); *State v. Garrett*, No. 01C01-9403-CR-00081, 1996 WL 38105 (Tenn. Crim. App. Feb. 1, 1996) (direct appeal); *see also Garrett v. Mays*, 777 F. App'x 816, 817 (6th Cir. 2019); *Garrett v. Westbrooks*, No. 3:13-CV-00190, 2017 WL 151616 (M.D. Tenn. Jan. 12, 2017); *Garrett v. Carpenter*, 2016 WL 1126520 (M.D. Tenn. Mar. 21, 2016) (included actual innocence claim based on new fire science). Of course, the Court can take judicial notice of those opinions and of its own records.[1] In his collateral attacks on his conviction, Garrett alleged that SA James Cooper testified falsely before the jury in

---

[1] *See United States v. White*, 58 F.4th 889, 897 n.4 (6th Cir. 2023); *Robinson v. Woods*, 901 F.3d 710, 713 n.1 (6th Cir. 2018); *Granader v. Pub. Bank*, 417 F.2d 75, 83 (6th Cir. 1969); *Garavaglia v. United States*, 648 F. Supp. 3d 887, 894 (E.D. Mich. 2022).

2003 and misled the jury. SOMF ¶ 55.

**C. Garrett's Release**

Claude Garrett's conviction was vacated on post-conviction by the Nashville District Attorney's Office's Conviction Review Unit. SOMF ¶ 56. Garrett remained incarcerated until May 2022, when the Davidson County District Attorney CRU determined the fire science used to convict Garrett was outdated and could no longer substantiate the verdict. SOMF ¶ 39. Importantly, the CRU did not find Garrett was innocent, but rather, it no longer had confidence in the verdict. SOMF ¶¶ 39, 56. Judge Monte Watkins vacated the conviction.[2] SOMF ¶ 56. In the order vacating Garrett's conviction, the post-conviction court found only that new scientific evidence proved that SA Cooper's testimony was unreliable and false – not that SA Cooper lied to anyone about anything. *Id.* Fire science has evolved significantly since 1992 and is continuously evolving. SOMF ¶ 54.

Director of the CRU Sunny Eaton represented the State of Tennessee during the proceeding vacating Claude Garrett's conviction. Eaton did not draw conclusions from her investigation about whether SA Cooper lied, was not trying to call anybody out for misconduct, did not recommend to District Attorney Glenn Funk that he come out and declare Garrett innocent, could not conclusively say that Garrett was innocent, was not aware of any evidence of a conspiracy by SA Cooper and the other defendants, was not aware of any evidence suggesting malicious prosecution,

---

[2] The outcome sought by Garrett had been years in the making and was based on his various habeas petitions over the years. But Garrett learned nothing new about the facts of his case because of his release. *Britton Enters. of Stuart Fla., Inc. v. U.S. Army*, 762 F.2d 1006 (table), 1985 WL 13024, at *2 (6th Cir. 1985) ("Criminal cases may be dismissed for many reasons and the mere fact of dismissal does not mean that the government's actions were unlawful or that there was no legal basis for charges initially brought. In short, Britton learned nothing by virtue of the August 29, 1980 dismissal that he could not have already known by the exercise of due diligence."). Plaintiff's legal theory here is simply his formerly unsuccessful habeas theory laundered into a Section 1983 case. *See, e.g.*, *Garrett v. Carpenter*, 2016 WL 1126520, at *25–30 (noting false testimony claim regarding Cooper's testimony and concluding state courts adequately addressed issue by pointing to passage of time between two trials).

and was not aware of anyone planting evidence in the case. SOMF ¶ 39. Many defendants in this case did not know or remember SA Cooper and testified that they did not conspire to convict Garrett. SOMF ¶¶ 40-52.

After his release, Garrett died in October 2022. SOMF ¶ 58. He pursued this lawsuit against various individuals who worked his case thirty years ago. Specifically, on October 24, 2022, he signed a Standard Form (SF)-95 claiming under the Federal Tort Claims Act former ATF Agent James Cooper "engaged in a course of negligence and/or intentional misconduct designed to cause criminal charges to be filed against Claude Garrett stemming from a fire at Garrett's residence." SOMF ¶ 57. Plaintiff Deana Watson has no personal knowledge of whether Garrett committed any crimes in February 1992 and has not conducted any investigation into Garrett's criminal case or this lawsuit apart from speaking with Garrett's attorneys and appearing on a television program called *Reasonable Doubt*. SOMF ¶¶ 59, 61.

### D. Plaintiff Files This Lawsuit

On May 8, 2023, Garrett's only daughter, Deana Watson, acting on behalf of Garrett's estate, sued former Nashville Metropolitan Fire Department Marshalls Kenneth Porter, Jr., Oddis Jenkins, and Patrick Hunt, as well as Former Nashville Metropolitan Officers William Michael Roland, David Miller and Desmond Carter (collectively the "Metro Defendants"). D.E. 1. Additional defendants are former ATF Special Agent James Cooper and the United States of America (collectively, the "Federal Defendants").

The operative complaint in this case is the Second Amended Complaint, filed on January 18, 2024. D.E. 67. Defendants Porter, Carter, Roland, and Hunt have been dismissed from this action. D.E. 107 (Porter), 126 (Carter), 137 (Roland, Hunt). On April 10, 2025, this Court dismissed Count V of the Amended Complaint (malicious prosecution against the United States under the FTCA). D.E. 131 at 15. Following Plaintiff's strategy of piecemeal-dropping certain defendants from this case on a whim, Counts I (violation of due process under Section 1983), II

(malicious prosecution, Fourth Amendment, under Section 1983), III (conspiracy under Section 1983), and VII (intentional infliction of emotional distress under Tennessee law) remain against Defendant SA Cooper. Only Count VI (FTCA for intentional infliction of emotional distress under Tennessee law) is left against the United States. D.E. 131, 132. On May 20, 2025, the remaining Metro Defendants Miller and Jenkins reached a tentative settlement on their claims. D.E. 135. That settlement did not affect the deadlines for this Motion or the trial date of November 4, 2025. *Id.*; D.E. 56. The Federal Defendants now move for summary judgment on the remaining claims.

## LAW & ARGUMENT

Summary judgment is proper where no genuine issue as to any material fact exists, thus entitling the movant to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and any inferences drawn from the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The burden on the movant is satisfied where there is an absence of evidence to prove the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). For a claim to survive a motion for summary judgment, the respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Further, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," the motion should be granted. *Id.* at 587. Any party opposing summary judgment must present non-hearsay that is admissible at trial. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing summary judgment must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary.") (emphasis in original); *Jacklyn v. Schering-Plough Healthcare Prods. Sale Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment.").

9

# I.     The Section 1983 Claims Cannot Survive Against Former SA James Cooper Because He is a Federal Actor.

Plaintiff specifically pleads in her Amended Complaint claims against SA Cooper "pursuant to 42 U.S.C. § 1983" under Counts I (violation of Due Process), II (malicious prosecution, Fourth Amendment) and III (conspiracy). D.E. 67 at PageID# 448, 449, 450. "Section 1983 establishes 'a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States.'" *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940–41 (6th Cir. 2010) (quoting *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 656 (6th Cir. 1994)). A plaintiff asserting a § 1983 claim must show: "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

At all relevant times, SA Cooper worked as a federal agent for ATF. D.E. 67, ¶ 20.[3] This fact is undisputed and, importantly, there is no allegation in the Amended Complaint that he ever acted *outside* the scope of his ATF employment.[4] Nevertheless, Plaintiff alleges that "by investigating the alleged commission of a crime under *state* law alongside state law enforcement officers, SA Cooper acted under color of *state* law." *Id.*, ¶ 21 (emphasis added). This assertion is incorrect. Simply stating that SA Cooper "acted under color of state law" does not make it true.

---

[3] At the time the United States answered the allegation in the operative complaint regarding Agent Cooper's employment, it lacked sufficient information and denied the allegation. D.E. 84 at ¶ 12; *see also* D.E. 58 at ¶ 12. As explained below, now that discovery has concluded, the United States has filed a certification regarding SA Cooper's employment status. D.E. 138, 139.

[4] "Tennessee law generally measures the scope of employment not by 'the motive of the servant, but whether that which he did was something his employment contemplated, and something which if he should do it lawfully, he might do in his employer's name.'" *Dolan v. U.S.*, 514 F.3d 587, 594 (6th Cir. 2008) (quoting *Roberts v. U.S.*, 191 Fed. App'x 338, 343 (6th Cir.), *cert denied*, 549 U.S. 1054 (2006)). As the *Dolan* Court reasoned, where individual federal defendants are employed by the federal government to investigate and prosecute cases but act improperly or maliciously in doing so, they are "still within the scope of their employment." 514 F.3d at 594.

As a federal agent, at all times Cooper acted under *federal* law and therefore he is not subject to suit under 42 U.S.C. § 1983.

In *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 429 (6th Cir. 2016), the court noted that as a general matter, "[t]he federal government and its officials are not subject to suit under [§ 1983]." *Id.* (*citing Conner v. Greef*, 99 F. App'x 577, 580 (6th Cir. 2004) (internal citations omitted)). This is because actions taken by federal agencies are "governed by and are taken pursuant to [federal statute]," *Ana Leon T. v. Fed. Rsrv. Bank*, 823 F.2d 928, 931 (6th Cir. 1987), and "federal officials typically act under color of *federal* law." *Strickland on behalf of Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997) (emphasis in original). An essential element of a claim under § 1983 is that the "conduct complained of must be committed under color of *state* law." *Ana Leon T.*, 823 F.2d at 931 (emphasis added). The district court dismissed Haines' § 1983 claims with prejudice for failure to state a claim on which relief may be granted, and the Sixth Circuit affirmed. *Haines*, 814 F.3d at 429.

Here, Plaintiff's § 1983 claims are not cognizable against SA Cooper because, at all times relevant, he was a federal agent acting on behalf of ATF. *See* Certification of Robert E. McGuire, filed contemporaneously herewith as D.E. 138, 139; *see also Pike v. United States*, 868 F. Supp. 2d 667, 677 (M.D. Tenn. 2012) (Section 1983 claims do not apply to those acting under color of federal law, including local or state law enforcement officers who are acting as federally deputized task force officers). Accordingly, SA Cooper is entitled to summary judgment on these claims. *See Dolan v. United States*, No. 3:06-CV-208, 2007 WL 784351, at *4–5 (E.D. Tenn. Mar. 13, 2007), *aff'd*, 514 F.3d 587 (6th Cir. 2008) (dismissing a § 1983 claim alleged against federal actors for failure to state claim under Rule 12(b)(6)); *Prasil v. United States*, No. 3:06-CV-402, 2007 WL 2173366, at *4 (E.D. Tenn. July 25, 2007) (same); *Albajon v. Gugliotta*, 72 F. Supp. 2d 1362, 1370 (S.D. Fla. 1999) (summary judgment for federal officer on Section 1983 claim).

Claims of constitutional violations by individuals acting under color of federal law are

properly pleaded pursuant to *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *See Pike*, 868 F. Supp. 2d at 677 (M.D. Tenn. 2012) (*citing Ellis v. Ficano*, 73 F.3d 361 (table), 1995 WL 764127 (6th Cir. Dec. 27, 1995) (Section 1983 did not apply where law enforcement officers were deputized as DEA Task Force agents, but "plaintiffs were left with an appropriate avenue of recovery against them under *Bivens*")).

While § 1983 claims and *Bivens* claims are similar, the Sixth Circuit has explicitly noted that courts are not required to convert a § 1983 claim against federal officials to one asserting *Bivens* violations. *See Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir. 2003) ("There lacks any authority … that a court must convert a Section 1983 claim … to one asserting *Bivens* violations."); *see also Nason v. United States Attorney's Office*, 2007 WL 1170742, at *2 (M.D. Tenn. Feb. 27, 2007) (citing *Mitchell*, 343 F.3d at 825 (6th Cir. 2003)). *But see Pike*, 868 F. Supp. 2d at 678 (noting that, conversely, *Mitchell* "plainly does not preclude a district court from exercising its discretion to do so"). Thus, Plaintiff's failure to properly plead *Bivens* provides independent grounds for dismissal of any purported constitutional claims. Despite Plaintiff amending her complaint twice before and litigating this case for years, she has never corrected this pleading deficiency. The United States filed a Motion to Dismiss because of questions over Plaintiff's standing. *See* D.E. 80, 81. Plaintiff never amended her allegations or altered her theory despite apparently deciding that certain defendants were no longer worth pursuing. D.E. 107, 126, 137. Given this pattern of imprecision, the § 1983 claims should not be gratuitously converted to *Bivens* by this Court. Rather, summary judgment should be entered in favor of SA Cooper because the claims cannot proceed against him, and they fail as a matter of law.

## II. Even if the Court Were to Construe Plaintiff's Section 1983 Claims Against SA Cooper as *Bivens* Claims, They Fail as a Matter of Law.

Plaintiff strategically chose not to allege any *Bivens* claims in this lawsuit and SA Cooper respectfully urges this Court **not** to convert the § 1983 claims or infer a *Bivens* remedy for the

alleged constitutional violations. However, even if the Court were to construe Plaintiff's § 1983 claims as *Bivens* claims, they fail as a matter of law.

The "core holding of *Bivens*" is "recognizing in limited circumstances a claim for money damages against federal officers who abuse their constitutional authority." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67 (2001). As discussed in *Ziglar v. Abassi*, 528 U.S. 120 (2017), the Supreme Court has only approved of an implied damages remedy under the Constitution three times. First was *Bivens*, in 1971, where the Court approved a Fourth Amendment claim against FBI agents for handcuffing a man in his own home without a warrant. 403 U.S. at 397. Second, in *Davis v. Passman*, 442 U.S. 228 (1979), the Court held that the Due Process Clause of the Fifth Amendment provided the plaintiff, a female secretary working for a Congressman, a damages remedy for gender discrimination. And third, in *Carlson v. Green*, 446 U.S. 14 (1980), the Court held that the Eighth Amendment gave an inmate a damages remedy against a federal official for failure to provide adequate treatment to an asthmatic inmate, resulting in the inmate's death.

After these cases, arguments for recognizing implied causes of action for damages began to lose their force, and the Supreme Court "adopted a far more cautious course before finding implied causes of action." *Ziglar*, 137 S.Ct. at 1855; *Left Fork Min. Co. v. Hooker*, 775 F.3d 768, 774 (6th Cir. 2014) (*Bivens* is a "limited, implied cause of action against federal employees for particularly egregious violations of the Fourth Amendment…"). Expanding the *Bivens* remedy is now a "disfavored" judicial remedy. *Ziglar,* 137 S.Ct. at 1856. And the court has consistently refused to extend *Bivens* to any new context or new category of defendant for almost forty years. *Id*. (citing cases where the Supreme Court declined to create a *Bivens* remedy).

To determine if a Plaintiff can assert a *Bivens* claim in a particular circumstance, the court must first look to see if the action was previously recognized or is different in a meaningful way from a previously recognized cause of action. The Supreme Court's recent decision in *Egbert v. Boule*, 596 U.S. 482, 495–96 (2022), cautioned federal courts that, before imposing *Bivens* liability

to a new context, even one with "almost parallel circumstances" to *Bivens*, they must question "whether there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" Applying that standard, the Court declined to allow a Fourth Amendment excessive force claim to proceed against a United States Border Patrol agent, noting that "plainly" "judicial intrusion" into weighing the costs and benefits of implying a cause of action was potentially harmful or inappropriate. *See id.*; *Jacobs v. Alam*, 915 F.3d 1028, 1036 (6th Cir. 2019) ("The Court's clear preference for not expanding such implied remedies is rooted in separation of powers, for most often Congress should decide whether to provide a damages remedy.") (internal quotations omitted).

In the instant case, Plaintiff alleges a vast array of constitutional claims, including that SA Cooper deliberately withheld exculpatory evidence, D.E. 67, ¶ 146; he influenced, and/or participated in the decision to prosecute Garrett through the fabrication of inculpatory evidence and the suppression of exculpatory evidence, *id*. at ¶ 154; that he, through the investigation, supplied the grand jury with false information to establish probable cause and obtain an indictment, *id*. at ¶ 155; that absent the fabrication of inculpatory evidence and suppression of exculpatory evidence, there was a lack of probable cause for Garrett's prosecution, *id*. at ¶ 156; that he and other defendants reached an agreement amongst themselves to frame Garrett for a crime and thereby deprive Garrett of his constitutional rights, including his constitutional rights to due process and to be free from malicious prosecution, *id*. at ¶ 162; and that SA Cooper along with other defendants each committed an overt act in furtherance of the conspiracy, *id*. at ¶ 163.

Certainly, Plaintiff's claims are fundamentally different from those recognized by *Bivens* and subsequent Supreme Court cases. This case is not about FBI agents handcuffing a man in his own home without a warrant, a Congressman firing his female secretary, or prison officials failing to treat an inmate's asthma. The Amended Complaint alleges constitutional violations by SA Cooper that would seek to expand *Bivens* beyond the contours of what the Supreme Court has

authorized in previous cases, *see Ziglar*, 137 S. Ct. 1843 (2017) (a claim arises in a new *Bivens* context "if the case is different in a meaningful way from previous *Bivens* cases decided by the [Supreme] Court"), and this Court should reject any expansion of the *Bivens* jurisprudence. There can be no *Bivens* claim because the fire science has changed.

This Court recently declined to expand *Bivens* in *Mynatt v. National Treasury Employees Union Chapter 39*, Case No. 3:17-cv-01454, 2019 WL 7454711 (June 10, 2019) (Richardson, J.). Mynatt, an employee of the Internal Revenue Service (IRS), served as Executive Vice President of the Local Union while Van Atta served as the President. *Id*. at *1. Mynatt was a full-time union steward who published several articles in the Local Union newsletter that were critical of IRS management at both the national and local levels. *Id*. Mynatt alleged that high-ranking executives began to intimidate and harass him. Mynatt contends that he and Van Atta started a website to inform National Union members of alleged National Union mismanagement. *Id*. The website received national publicity, causing high-ranking officials to put pressure on Van Atta to stop Mynatt's efforts. Mynatt contacted the Washington Post and gave an interview that resulted in a full-page article about the upcoming election for National Union President. *Id*. Van Atta told Mynatt the Local Union would no longer fund his attendance at the upcoming convention, and Van Atta removed Mynatt as union steward. Mynatt alleged that Van Atta then traveled to meet with National Union officials to conspire to retaliate about him. *Id*.

Mynatt alleged that Van Atta sent letters to all members of the Local Union accusing Mynatt of financial misfeasance. A criminal investigation ensued, followed by a Local Union trial removing Mynatt from his office as Executive Vice President. *Id*. at *1-2. The case made its way to the state grand jury and Mynatt was indicted for two state felonies. Days later he was stopped for a traffic violation, arrested on an outstanding warrant and taken into custody and detained overnight for the outstanding state law charges. *Id*. at *2. Mynatt claims that for a year he refused to plead guilty in exchange for a reduction in the charges and refused to resign his IRS position in

exchange for the District Attorney dropping all charges. The District Attorney ultimately retired the charges against Plaintiff for one year and then formally dismissed them. *Id.* Mynatt alleged in his complaint that certain union officials conspired and worked together maliciously to prosecute him and to deny his civil rights. Under § 1983, he alleged a violation of his Fourth Amendment rights, conspiracy to violate his civil rights, and violation of his First Amendment rights. He also alleged state law claims of malicious arrest and prosecution, and civil conspiracy, as well as *Bivens* violations under the First, Fourth, and Fifth Amendments against individual federal defendants. *Id.*

This Court found that Mynatt's alleged Fourth Amendment claim presented a new context for purposes of *Bivens*. "This case concerns an alleged malicious arrest and prosecution arising from an alleged conspiracy among union, state and federal officials, over the course of several years, to retaliate, harass, falsely accuse of financial malfeasance, wrongfully prosecute, and deny civil rights of a federal employee." *Id.* at *8. This Court reasoned: "The context is entirely different from the Fourth Amendment claim in *Bivens*." *Id.* Dismissing the claims, this Court further noted, "Because this case is fundamentally different from anything recognized by *Bivens* or subsequent Supreme Court cases, the Court believes that Congress is better suited to extend a damages remedy against federal employees in this situation." *Id.* at *9; *see also Cain v. Rinehart*, No. 22-1893, 2023 WL 6439438, at *3 (6th Cir. July 25, 2023) (refusing to expand *Bivens* in Fourth Amendment context); *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 869 (6th Cir. 2022) (refusing to expand *Bivens* in First Amendment context). *Cf. also Cantu v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019) ("Rather, Cantú alleges Moody and LaBuz violated the Fourth Amendment by falsely stating in affidavits that Cantú willingly took possession of the cooler ... to suggest he knowingly participated in a drug transaction ... to induce prosecutors to charge him ... to cause Cantú to be seized.") (refusing to expand *Bivens*). Like *Mynatt*, this Court should reject Plaintiff's claims because they present a new context for the purposes of *Bivens*.

III.    **Plaintiff Lacks Sufficient Proof for Any *Bivens* Claim.**

The Sixth Circuit has continued to recognize certain garden-variety *Bivens* claims post *Ziglar*. *See Jacobs v. Alam*, 915 F.3d 1028, 1036 (6th Cir. 2019) (citing *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015)) (malicious prosecution, false arrest, fabrication of evidence and civil conspiracy); *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014) (false arrest); *Burley v. Gagacki*, 729 F.3d 610, 621 (6th Cir. 2013) (excessive force). Even if this Court allows Plaintiff's § 1983 claims to proceed as *Bivens* claims, the facts will show there is no issue for trial. The Court should grant summary judgment because the defendants carried out their job duties when investigating Garrett's case. No more, no less. While Plaintiff may disagree with the investigative techniques and the investigators' conclusions, none of that rises to the level of violating Garrett's constitutional rights.

A.  **The Defendants Conducted a Routine Investigation.**

When the fire broke out at Garrett's and Lance's residence in February 1992 in the early morning, Garrett managed to escape with minor burns. SOMF ¶ 9. Lance did not. SOMF ¶¶ 1, 8. Her body was recovered by firefighters in a precarious location and position – in the utility room lodged between the washer machine and the wall with random items laying on top of her. SOMF ¶ 7. Garrett first told firefighters Lance would be in the front room but changed his story and told them to look in the utility room.  SOMF ¶¶ 4,5. It is undisputed that Garrett had been drinking beer and smoking marijuana hours before the fire occurred. SOMF ¶¶ 3, 60. It is also undisputed that Lance reported domestic violence in her relationship with Garrett, according to at least one police report, her family, and co-workers. SOMF ¶¶ 2, 15, 16.

MNPD Detectives Miller and Roland arrived on the scene at 6:22am. SOMF ¶ 13. MNFD Arson investigator Kenneth Porter arrived on the scene at 6:30am, began his inspection and noticed a strong odor of kerosene, and a burn pattern suggesting a liquid accelerant may have been used to start the fire. SOMF ¶ 10. Firefighters assisted Porter in removing debris from the living room

floor and used a hose to wash the area, revealing what appeared to Porter to be a large pour pattern on the floor. SOMF ¶ 12. Porter also observed the aluminum storm door was burned off indicating a very hot and fast-burning fire. *Id*. Porter gathered samples for testing by the Tennessee Bureau of Investigation ("TBI"). SOMF ¶ 10.

Porter told Detectives Miller and Roland the fire was of a suspicious nature and may have been intentionally set. SOMF ¶ 14. They began to gather evidence, obtained a warrant to search the house, and took an initial statement from Garrett who appeared nervous and fidgety. SOMF ¶¶ 14, 15, 17, 19. Detective Miller called ATF SA Cooper to the scene to assist in the investigation. SOMF ¶ 21. SA Cooper, a certified fire investigator, had previously worked arson investigations with MNPD. SOMF ¶¶ 22, 23. On average he assessed 25 fires per month, determining whether they were accidental, undetermined, or incendiary. SOMF ¶ 24.

Almost 13 hours later, at 6:20 pm, Special Agent Cooper, Detectives Miller and Roland, and Regina West,[5] an investigator for the District Attorney's Office, arrived at the scene. SOMF ¶ 25. Upon their arrival, the firefighters and Porter had already washed the scene and removed certain items from the floor. SOMF ¶ 12. Viewing the same burn pattern on the floor that Porter had identified, SA Cooper determined the origin of the fire was in the living room. SA Cooper ruled out other fire sources, such as the electrical box and kitchen stove burners, and the team sent the kerosene heater for testing. SOMF ¶ 26. SA Cooper also collected a sample of the baseboard for testing by TBI. SOMF ¶ 31.

In the kitchen, SA Cooper, Detectives Miller and Roland, and West observed a wet bedspread that smelled of kerosene partially under the refrigerator. SOMF ¶ 27. West found the bedspread. SOMF ¶ 49. SA Cooper actually tripped over it, and asked the others, "What is this?" SOMF ¶ 28. They cut a piece of the bedspread and sent the sample to the TBI for testing. SOMF

---

[5] West's last name is currently Beene. Exhibit 15, Beene Dep. at 28:18-20.

¶ 33. Adjacent to the kitchen, the team examined the utility room door and latch. SOMF ¶ 29. SA Cooper observed that the inside of the door was clean, thus appearing that the door was in a closed position when the fire occurred. *Id*. This observation was consistent with Captain Jenkins' account that he had to to "mess[] with it" in order to open it and rescue Lance. SOMF ¶ 6.

The defendants in this case investigated this crime scene and assessed the evidence as any investigative team would do. There is no dispute that Porter and SA Cooper observed the same pattern of charring on the floor. SOMF ¶¶ 10, 31. The fire itself created the charring; neither Porter nor SA Cooper manufactured it. Porter was the one who initially visited the scene and determined the fire could be an arson. There is no dispute that SA Cooper visited the scene 13 hours later and, upon inspection, separately reached the same conclusion. The conclusions that Porter and SA Cooper drew from the charring were perhaps factually mistaken in 1992 based on their training in that era, or perhaps the conclusions a fire expert would (or could) draw in 2025 from the same charring would be different. But Plaintiff acknowledges that fire science has evolved significantly over the years SOMF ¶ 54. And thus, Plaintiff must bring forward some affirmative proof of intentional wrongdoing rather than mistaken belief. Their conclusions can be scientifically debated and second-guessed, but even if Porter and SA Cooper reached an incorrect conclusion, that does not amount to a constitutional violation under *Bivens* or any other theory alleged in this case.

Plaintiff alleges that SA Cooper, Miller, and Roland "planted the bedspread to fortify their theory that Claude intentionally set the fire[,]" and "planted" cardboard in the baseboard sample. D.E. 67 at ¶¶ 64, 69, 70, 75, 76, 92–94. There is no evidence whatsoever to support these bold assertions. Alleging the bedspread and cardboard were "planted" is founded on nothing, and these accusations should be summarily rejected by this Court. Plaintiff has done nothing to develop these theories, and after months and months of discovery has failed to substantiate these claims at all.[6]

---

[6] Indeed, in answering an interrogatory regarding the motivations the Defendants held for their alleged conduct to falsely imprison and convict Garrett, Plaintiff objected and wrote, "Plaintiff

Whether the utility door was latched or unlatched at the time of the fire remains unknown. However, the fact remains that Lance was found in (and thus did not flee) the utility room. SOMF ¶¶ 1, 7. We may never know whether Lance had the ability to flee. That Jenkins had to "mess with" the door to open it, and the inside of the door displayed no smoke damage or burns is evidence that speaks for itself. Any contention that SA Cooper told the prosecutor the door was locked without a scientific basis is not actionable for the purposes of recovering under the theories Plaintiff has pled. D.E. 67 at ¶¶ 64, 69, 70, 75, 76, 92–94. There is no admissible proof supporting these theories.

The entire sequence of Plaintiff's allegations makes a factual jump that this Court should not indulge. Inconsistencies or outdated investigational techniques do not bespeak a conspiracy. There is no admissible proof, no witness, and no documents to affirmatively prove those claims. A trial will not change or clarify any of this. The proof is 30 years old. Garrett, Porter, and other witnesses have died, and the Plaintiff, Garrett's daughter, has no personal knowledge of the underlying facts. SOMF ¶¶ 61. The defendants have each testified in their depositions that no conspiracy existed; they did not even know Garrett and they did not work together to achieve a desired result. SOMF ¶¶ 40-52. In reality, each of the defendants in this case worked independently to investigate a potential crime. Collectively, they inspected the scene, gathered appropriate samples, interviewed Garrett, spoke to witnesses, and wrote up reports and diagrams.[7]

The local prosecutor reviewed the evidence and decided to indict, take the case to grand jury, and Garrett was convicted of murder – twice. Although Plaintiff is critical of the investigation,

---

answers that only Defendants can know their true motives for framing Garrett for a crime he did not commit. Plaintiff's counsel has theories as to those motives based on fair inferences from the evidence but is not required to disclose them because they related to counsel's mental impressions and strategy." Exhibit 21, Plaintiff's Responses to United States' First Set of Interrogatories, at ¶ 9 (Feb. 7, 2024). The time for games and delay has passed. No such motivations are in this record.

[7] And that is why Plaintiff has continued dismissing defendants from this case following each defendant's deposition. D.E. 107 (Porter), 126 (Carter), 137 (Roland, Hunt). Plaintiff provided no explanation for any of these dismissals, and one can only presume they were dismissed because Plaintiff knew she lacked sufficient proof to prevail on those claims against those defendants.

she cannot point to evidence that any of the defendants violated Garrett's constitutional rights for simply carrying out their job duties. Plaintiff may argue that the investigators in this case should have done X when they did Y, or Plaintiff may argue that the investigators in this case failed to do X or Y entirely. But none of this bespeaks a conspiracy to convict Garrett. As the Director of the Conviction Review Unit said during her deposition:

> Q. **Is there anything in your final report indicating that Cooper entered a conspiracy with any of the other** --
> A. **No.**
> Q. **-- defendants? Are you aware of any evidence at all that suggests a conspiracy among Cooper and the other defendants?**
> A. **No.**
> Q. **Are you aware of any evidence suggesting at all of malicious prosecution?**
> A. **No.**

SOMF ¶¶ 39 (emphases added). Garrett's indictment and convictions were founded on probable cause. While there may have been enough scientific proof to convince a judge to release Garrett, the same body of proof contains nothing indicating that the investigators hatched a plot.

In an affirmative criminal case brought by the State, problems with an investigation are important from a defense perspective. They bear on guilt, innocence, and reasonable doubt. But here, where Plaintiff bears the burden of proof to show some violation of the Constitution occurred, the same evidence will not suffice. Poor police work is not enough to show an intentional tort or malicious prosecution. Here, there is no genuine issue of material fact because there is no affirmative, admissible proof of wrongdoing. There are open and likely unresolvable questions as to whether Garrett was in fact guilty of the crimes the State charged. There are *no* questions of material fact as to whether these agents and officers conspired to wrongfully incarcerate Garrett. If Garrett *was* in fact guilty and committed these crimes, then that means there was no conspiracy to wrongfully convict him. If Garrett did *not* in fact commit these crimes, a conspiracy cannot automatically be presumed and must be properly pled and proven. Plaintiff must still prove a conspiracy or unconstitutional conduct, and that evidence must have a clear avenue into evidence.

Here there is none. Accordingly, the court should grant summary judgment in SA Cooper's favor.

**B. Plaintiff's Case Is Founded Solely on Speculation, Conjecture and Fantasy, and Thus SA Cooper is Entitled to Summary Judgment.**

Even if this Court converts the Section 1983 claims to *Bivens* claims (and it should not), Plaintiff cannot prove any of the *Bivens* claims.[8] *Holloway v. Mason*, 948 F.2d 1289 (table), 1991 WL 241973, at *2 (6th Cir. 1991) ("It is well-established that a party may prevail upon a summary judgment motion based upon a showing of a nonmovant's lack of proof.") (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)); *Fowler v. Metro. Life Ins. Co.*, 938 F. Supp. 476, 478 (W.D. Tenn. 1996) ("The moving party may support the motion for summary judgment with affidavits or other proof *or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial*.") (emphasis added) (noting that "the mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient). Here, the Plaintiff can present no admissible evidence that SA Cooper falsified evidence or conspired with the other agents on this case to wrongfully incarcerate Claude Garrett. Plaintiff bears the burden of proof to show that a trier of fact could find that all of the elements of the remaining counts in this case have been met, and she cannot.

The non-movant opposing summary judgment must be able to show "'probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.'" *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (quoting *Moody v. St. Charles County,* 23 F.3d 1410, 1412 (8th Cir. 1994)) (cleaned up). Mere speculation, conjecture, and fantasy are all that underlie Plaintiff's claims. Any conclusion that Cooper committed any of the alleged acts would require this Court to make a "leap of faith" that it cannot and should not. *Est. of Beaudry v. TeleCheck Servs., Inc.*, 477 F. Supp. 3d 681, 686–87 (M.D. Tenn. 2020), *aff'd*, 854

---

[8] As explained below, the intentional inflictions of emotional distress claims are time-barred and Plaintiff also cannot prove essential elements of those claims. But the same arguments in this Section regarding lack of proof apply with equal force to those claims too.

F. App'x 44 (6th Cir. 2021) (pointing to *Lewis*); *see also Gentry v. Hershey Co.*, 687 F. Supp. 2d 711, 719 (M.D. Tenn. 2010) ("Hypotheses, unsupported by evidence, are not enough to submit a case to a jury."). This case is a previously asserted habeas theory packaged as a Section 1983 case.

As this Court has explained, a showing of the absence of a genuine dispute sufficient under Rule 56(c)(1)(B) is sufficient if there is demonstrably good reason "based on common sense, experience, and extant information not reasonably disputable though not in the record [] to conclude at least preliminarily that a genuine dispute does not (or does) exist." *Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-CV-00491, 2022 WL 1283087, at *13 n.37 (M.D. Tenn. Apr. 28, 2022). Plaintiff's approach to this case can be gleaned from even a cursory review of her responses to reasonable discovery requests by the United States. In response to the United States' interrogatory regarding what evidence supported the existence of a conspiracy in this case, Plaintiff offered a litany of conclusory statements with no citations. For example, Plaintiff averred, among other things:

> Defendant Cooper knew that the scene was contaminated by the time he had arrived to perform his investigation.
>
> Defendant Cooper—and potentially the other Defendants and investigators who were with him when he walked the scene—removed the bedspread from one of the bedrooms and placed it in the kerosene-tinged water next to the compromised kerosene container.
>
> Defendants Cooper and Miller intentionally failed to preserve the bedspread, and instead only retained a small sample of it.
>
> Defendant Cooper—and potentially other Defendants who had knowledge of his actions—intentionally withheld from the prosecutor (1) his knowledge that the scene was contaminated by, inter alia, the breach in the kerosene container, (2) that he included debris from a different location than the origin of the fire in his baseboard sample; and (3) that he and others planted the kerosene-soaked bedspread.

Exhibit 21 at 5, 7. Plaintiff objected to related interrogatories requesting that she identify each instance the defendants fabricated physical evidence, identify written communications supporting Plaintiff's theories, identify the role each defendant played in the conspiracy, and identify all

evidence that SA Cooper fabricated and concealed evidence. Exhibit 21, at Interrogatory Nos. 5, 10, 11, 17, 18. The time for objecting to such questions as premature has passed. Plaintiff must now present admissible proof of her claims to obtain a trial, and she cannot.

### C. SA Cooper Has Absolute Immunity for His Trial Testimony in Both the 1993 and 2003 Trials.

SA Cooper testified at both of Garrett's trials. SOMF ¶¶ 38. SA Cooper can never be liable for statements made at a criminal trial. "[A] trial witness has absolute immunity with respect to *any* claim based on the witness' testimony." *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) (emphasis in original); *see also Briscoe v. LaHue*, 460 U.S. 325, 329 (1983); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 72 (Tenn. 2001) (same privilege under Tennessee law). The United States can never be liable for the alleged communication of false information, failure to communicate correct information, intentional concealment, negligent concealment, or misrepresentations. *Dyer v. United States*, 96 F. Supp. 2d 725, 737 (E.D. Tenn. 2000) ("The FTCA precludes imposition of any liability based upon the government's alleged communication of false information or failure to communicate correct information."). Any number of the allegations in this case can be characterized as assertions of misrepresentation and deceit by SA Cooper: misleading the prosecution, fabrication of test results and the location of the comforter and conspiring to alter documentation of the scene. To the extent those assertions can be read as claims of deceit or misrepresentation, they are not actionable under the FTCA. *Cf. Williams v. Schismenos*, 258 F. Supp. 3d 842, 862 (N.D. Ohio 2017), *aff'd*, 738 F. App'x 342 (6th Cir. 2018) ("This attempt to pick apart the police report falls woefully short of a 'substantial showing' that the officers stated a deliberate falsehood or showed a reckless disregard for the truth necessary to satisfy the first prong of the test.") (summary judgment granted for defendants in malicious prosecution and false arrest claim under Section 1983).

## IV. SA James Cooper Cannot be Sued for Intentional Infliction of Emotional Distress (Count VII) Under Tennessee State Law.

Plaintiff's Intentional Infliction of Emotional Distress ("IIED") claim against the United States (Count VI) and the same tort claim against SA Cooper under Tennessee law (Count VII) overlap in the sense that they seek to hold the United States and SA Cooper liable for the same conduct. The state law IIED claim must be dismissed against SA Cooper.

Under the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679 (the "Westfall Act"), the United States may be substituted in a civil action for money damages brought against a federal employee who is alleged to have committed a common law tort while acting within the scope of his or her employment. *Osborn v. Haley*, 549 U.S. 225 (2007); *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125 (1996) (citing *Arbour v. Jenkins*, 903 F.2d 416, 420 (6th Cir. 1990). The Westfall Act provides in pertinent part as follows:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).

The Attorney General has delegated to the United States Attorney the authority to provide the Section 2679(d) certification. 28 C.F.R. § 15.3 (1989). In this case, the Acting U.S. Attorney for the Middle District of Tennessee, Robert E. McGuire, provided written certification that James Cooper was acting within the scope of his ATF employment in connection with the events underlying this suit. Mr. McGuire's certification provides *prima facie* evidence that the employee was acting within the scope of his employment. *See RMI Titanium*, 78 F.3d at 1143. "Whether an employee was acting within the scope of his employment is a question of law, not fact, made in accordance with the law of the state where the conduct occurred. *Id*. (citing *Henson v. NASA*, 14 F.3d 1143, 1147 (6th Cir.) *amended on reh'g*, 23 F.3d 990 (6th Cir. 1994)).

25

Because there is no dispute about SA Cooper's employment status as an ATF agent, and the Acting United States Attorney has certified that Cooper was acting within the scope of his employment at all times relevant to this lawsuit, the United States substitutes itself in place of Cooper. Therefore, Count VII must be dismissed. *See RMI Titanium Co.*, 78 F.3d at 1143.

## V. The Intentional Infliction of Emotional Distress Claim Against the United States (Count VI) Must Be Dismissed.

As explained above, SA Cooper cannot be sued for common law torts committed within the scope of his federal employment, and so Plaintiff's sole remedy is against the United States. *Priest v. United States*, No. 3:11-CV-00557, 2011 WL 5023277, at *2 (M.D. Tenn. Oct. 20, 2011) (quoting 28 U.S.C. § 1346(b)(1)); *see also generally M.J. ex rel. Beebe v. United States*, 721 F.3d 1079, 1084 (9th Cir. 2013). Thus, Counts VI and VII collapse into one count against the United States, but it cannot survive for two reasons. First, the statute of limitations has long since run under the FTCA. Second, Plaintiff cannot prove two vital elements of any IIED claim – intentional or reckless conduct, and outrageousness.

### A. The Statute of Limitations has Long Since Run

The FTCA imposes a two-year statute of limitations from the accrual date of the cause of action. 28 U.S.C. § 2401(b); *see also Doe v. United States*, 280 F. Supp. 2d 459, 464 (M.D.N.C. 2003) ("Although state law determines whether a cause of action exists under the FTCA, federal law governs when that cause of action accrues."); *Tolliver v. United States*, 831 F. Supp. 558, 560 (S.D.W. Va. 1993) ("While state law, here the law of West Virginia, determines whether a cause of action exists, federal law defines the limitations period and determines when the cause of action accrued."). The statute of limitations operates as an affirmative defense; once the government shows that the statute has run, the burden shifts to plaintiff to establish an exception applies. *Hogan v. United States*, 42 F. App'x 717, 722 (6th Cir. 2002).

Under federal law, the cause accrues when the plaintiff has reason to know of the injury

that forms the basis of the action and how it is connected to the defendant. *Brown v. Nationsbank Corp.*, 188 F.3d 579, 589–90 (5th Cir. 1999) (affirming dismissal based on statute of limitations); *see also Hogan*, 42 F. App'x at 722 ("[A] plaintiff's claim 'accrues' when the plaintiff knew or should have known of the injury and its cause.") (citing *United States v. Kubrick*, 444 U.S. 111, 117–24 (1979)). And accrual does not "await awareness" by the Plaintiff that he was injured. *Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009) (quoting *Kubrick* and affirming dismissal based on statute of limitations).[9]

  In the context of an intentional infliction of emotional distress claim based on fabricated evidence, the claim accrues when Plaintiff is aware of her injuries. *Myles v. United States*, No. EDCV 19-2036 PSG (KKX), 2020 WL 4032293, at *3 (C.D. Cal. Mar. 3, 2020) ("Because Plaintiff was aware of her injuries and their source in December 2014 when she was charged and arrested, the statute of limitations on her claims ran in December 2016, well-before her November 2018 filing date.") (dismissing IIED claim). Here, that is when Plaintiff was arrested and charged in 1992 with what he alleges was false testimony and fabricated evidence. Thus, that is when he was on notice that conduct attributable to the government was more than likely the cause of his distress. *Amburgey v. United States*, 733 F.3d 633, 638 (6th Cir. 2013) ("We agree with the government's contention to the extent that Delma did not need to know for certain what was the cause of Jerry's death before her claim accrued, or even that the conduct attributable to the government was more likely than not the cause."); *Kerstetter v. United States*, 57 F.3d 362, 365 (4th Cir. 1995) ("So long as the plaintiff knows 'the critical fact' of 'who has inflicted the injury,' he can act to protect his rights by inquiring whether the injury was inflicted negligently."). Garrett

---

[9] The same analysis would bar these claims even if Tennessee law applied. Tennessee has a one-year statute of limitations for IIED claims. *Leach v. Taylor*, 124 S.W.3d 87, 91 (Tenn. 2004). And the same analysis applies – accepting his theories as true, Garrett knew decades before filing this case of the circumstances that led to his incarceration. *Harvey v. Martin*, 714 F.2d 650, 653 (6th Cir. 1983) (discussing Tennessee's discovery rule); *see also Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 329 (6th Cir. 1989) (similar).

filed his SF-95 with ATF **almost three decades later**, on October 24, 2022. SOMF ¶¶ 57. Needless to say, this would be far beyond the statute of limitations.

Equitable tolling allows a court to extend a statute of limitations period when a litigant's failure to file within that period was unavoidable. *Jackson v. United States*, 751 F.3d 712, 718 (6th Cir. 2014); *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010) (the Court may "toll a statute of limitations when a litigant's failure to meet a legally mandated deadline unavoidably arose from circumstances beyond that litigant's control."). In cases where the United States is involved, courts apply the doctrine "sparingly, … not when there has only been a garden variety claim of excusable neglect." *Jackson*, 751 F.3d at 718 (quoting *Chomic v. United States*, 377 F.3d 607, 615 (6th Cir. 2004)). The plaintiff carries the burden of establishing her entitlement to equitable tolling. *Robertson*, 624 F.3d at 784.

Here, the Court should not toll the statute of limitations. Presume that Garrett's allegations against SA Cooper are true—then Garrett knew when he was first arrested that conduct attributable to the government was most likely the cause. And throughout the decades in which Garrett made collateral attacks on his conviction, he continually averred that SA Cooper lied and presented false testimony. *See, e.g.*, Case No. 3:13-cv-190 (M.D. Tenn.), D.E. 1 at PageID# 7–8 ("The petitioner argues that state witnesses Bobby Alcorn, James Cooper, and David Miller presented false testimony at the second trial."), PageID# 60 ("The petitioner contends the prosecution in this case perpetrated fraud upon the trial and appellate courts through its knowing use of false, fabricated and perjured testimony of some of the state's witnesses."); *id.* D.E. 1-4 at PageID# 105 ("Agent James Cooper testified falsely at the second trial."). Thus, accepting his theories as true, Garrett certainly knew as of at least 2013 that conduct attributable to the government was the cause of his conviction, and he was represented by counsel during those years too. Considering "[t]here is a presumption against equitable tolling for claims against the United States," *D.B. by & Through Lundy v. Shelby Cnty. Health Care Corp.*, 501 F. Supp. 3d 602, 606 (W.D. Tenn. 2020), *aff'd*, 861

F. App'x 634 (6th Cir. 2021), Plaintiff cannot articulate any good reason to overcome that presumption where Garrett knew of this claim for years but failed to timely allege it.

**B. Plaintiff Cannot Prove Critical Elements of IIED Under Tennessee Law.**

Under Tennessee law, a plaintiff must show that the defendant's conduct was intentional or reckless, so outrageous that it is not tolerated by civilized society, and that it resulted in serious mental injury to plaintiff. *Akers v. Prime Succession of Tennessee, Inc.*, 387 S.W.3d 495, 502 (Tenn. 2012) (affirming jury verdict on IIED where crematory operator was dumping corpses and commingling remains with foreign items). Plaintiff cannot show that Cooper's conduct is intentional or outrageous, and thus her claims must fail on the first and second elements.

**1. Plaintiff Cannot Show That SA Cooper's Conduct was Intentional or Reckless.**

Plaintiff's claims for IIED fail on the first element: that the defendant acted with intent or recklessness. *Akers*, 387 S.W.3d at 502–03 (discussing intentionality and recklessness). The bar for showing intentional or reckless conduct under Tennessee law is high. *Bain v. Wells*, 936 S.W.2d 618, 623 (Tenn. 1997) ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.") (quoting precedent citing the Restatement (Second) of Torts). A person acts intentionally under Tennessee law "when it is the person's conscious objective or desire to engage in the conduct or cause the result[,]" and acts recklessly "when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). These are high standards of conduct.

The evidence in this case does not meet either measure of conduct. Certainly, there is no evidence in this record that SA Cooper acted "intentionally" to wrongfully incarcerate Garrett.

There is no "smoking gun" in this case where all of the defendant-officers discussed their intentions to frame Garrett on a wiretap or recorded call. There is not a shred of evidence in this record of a "conscious objective or desire" to do anything but normal police work. On that score, Plaintiff can show nothing more than speculation and conjecture.

If the record cannot support a claim for *intentional* conduct, then neither can it support a claim for *reckless* conduct. Plaintiff's theories amount to a speculative conclusion that SA Cooper's work constitutes shoddy or negligent police work. Even accepting as true that SA Cooper's investigation had flaws or was unscientific, then Plaintiff's theory of liability on this claim would mean that every police officer or agent conducting a routine investigation could commit a tort by investigating any case. A putative defendant might be innocent in every criminal investigation. If officers could be sued for IIED every time they investigate a criminal case, then no officer would participate in the criminal process. And here, the facts do not meet the "gross deviation" standard of recklessness.

### 2. SA Cooper's Conduct Was Not Outrageous.

Showing outrageous conduct is a high bar under Tennessee law. *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1, 22 (Tenn. 2021) (surveying caselaw). The conduct must be atrocious. *Finley v. Kelly*, 384 F. Supp. 3d 898, 912 (M.D. Tenn. 2019). At a different stage in a case like this, alleging that a law enforcement officer wrongfully incarcerated an innocent plaintiff might pass muster under Rule 12 before discovery has commenced. *Stacy v. Clarksville Police Dep't*, No. 3:24-CV-00470, ___ F. Supp. 3d ___, 2025 WL 880149, at *8 (M.D. Tenn. Mar. 21, 2025) (Crenshaw, J.) (taking allegations in complaint as true, officer's conduct using law enforcement position to bring charges that had no basis in law could meet the test for outrageousness) (Rule 12 stage). But this is summary judgment, where a plaintiff must "put up or shut up." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). All of Plaintiff's evidence against Cooper, as exemplified by her interrogatory responses and the Amended Complaint itself, is conjecture and

speculation. While violence by police against a suspect might be considered outrageous, *e.g.*, *Harrison v. City of Dickson, Tenn.*, No. 3:11-CV-01044, 2013 WL 1482950, at \*17 (M.D. Tenn. Apr. 11, 2013) (collecting cases on unprovoked police beatings), routine police work, even if parts of that work might have been mistaken, is not outrageous.

## CONCLUSION

The claims in this case cannot survive for any number of reasons, and the Defendants' Motion for Summary Judgment should be granted in its entirety.

Respectfully submitted,

ROBERT MCGUIRE
Acting United States Attorney
Middle District of Tennessee

s/ Michael Tackeff
ANICA C. JONES, B.P.R. # 025325
MICHAEL C. TACKEFF, B.P.R. #036953
KIMBERLY S. VEIRS, B.P.R. #034811
Assistant United States Attorneys
719 Church Street, Suite 3300
Nashville, TN 37203
Telephone: (615) 736-5151
Email: michael.tackeff@usdoj.gov
        kimberly.veirs@usdoj.gov
        anica.jones@usdoj.gov
*Attorneys for the United States*

TUNE, ENTREKIN & WHITE, P.C.
s/ Peter J. Strianse
PETER J. STRIANSE
Capitol View
500 11th Avenue North, Suite 600
Nashville, TN 37203
Email: pstrianse@tewlawfirm.com
*Attorney for James Cooper*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 23, 2025, a copy of the foregoing was filed electronically. A copy will be sent to the following, if registered, by operation of the Court's electronic filing system. If not registered, a copy was sent by United States first class mail, postage prepaid, to the following:

| | |
|---|---|
| Kathleen T. Zellner<br>Nicholas Curran<br>Joanna P. Kluzowska<br>Kathleen T. Zellner & Associates, P.C.<br>4580 Weaver Parkway, Suite 204<br>Warrenville, IL 60555<br>Email: attorneys@zellnerlawoffices.com<br>Email: nick@zellnerlawoffices.com | Kyle F. Mothershead<br>Relentless Advocacy, PLLC<br>7000 Executive Center Drive, Suite 240<br>Brentwood, TN 37027<br>Email: kyle@relentlesslaw.com |
| Melissa S. Roberge<br>John W. Ayers<br>Michael R. Dohn<br>Metropolitan Legal Department<br>P.O. Box 196300<br>Nashville, TN 37219<br>Email: melissa.roberge@nashville.gov<br>Email: will.ayers@nashville.gov<br>Email: michael.dohn@nashville.gov | Peter J. Strianse<br>Tune, Entrekin & White, P.C.<br>Capitol View<br>500 11th Avenue North, Suite 600<br>Nashville, TN 37203<br>Email: pstrianse@tewlawfirm.com |

s/ Michael Tackeff
MICHAEL C. TACKEFF
Assistant United States Attorney