# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION

| | |
|---|---|
| DEANA WATSON, as Independent Administrator of the Estate of CLAUDE GARRETT, Deceased, | |
| Plaintiff, | |
| | Case No. 23–cv–00456 |
| v. | |
| | Honorable Eli Richardson, Judge Presiding. |
| Current and/or Former ATF Agent JAMES COOPER, and THE UNITED STATES OF AMERICA, | |
| | Magistrate Judge Jefferey S. Frensley |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER RESPONSE IN OPPOSITION TO DEFENDANTS UNITED STATES AND JAMES COOPER'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.01, Plaintiff Deana Watson, as Independent Administrator of the Estate of Claude Garrett, Deceased, respectfully submits this Memorandum in Support of her Response in Opposition to Defendants United States and James Cooper's Motion for Summary Judgment.

# TABLE OF CONTENTS

I. Introduction ................................................................................................1

II. Statement of Facts ......................................................................................2

    A. Initial Investigation ...............................................................................2

    B. Cooper Joins the Investigation.............................................................6

    C. Video Walkthrough of the Scene .........................................................9

    D. The Desmond Carter Letter ................................................................9

    E. The Prosecution's Reliance on Metro PD and Cooper ............................10

    F. Evidence Elicited at Garrett's Trials.......................................................11

    G. CRU Report, Conviction Vacated, and Charges Dismissed.....................13

    H. Evidence of Conspiracy to Deprive Constitutional Rights ......................16

III. Argument...................................................................................................21

    A. Plaintiff's § 1983 Claims Against Cooper are Viable Because Cooper Acted Under Color of State Law, and Because he Engaged in a Conspiracy with Metro Detectives to Deprive Garrett of his Constitutional Rights.....................21

    B. Cooper Does Not Have Absolute Immunity for his Pretrial Nontestimonial Misconduct ..............................................................................................28

    C. Plaintiff's Intentional Infliction of Emotional Distress Claim is Timely, and Plaintiff has Demonstrated Triable Issues of Fact on the Elements of her Claim ......................................................................................................29

IV. Conclusion.................................................................................................35

# I. INTRODUCTION

Beginning in 1992, Defendant James Cooper and various employees of the Metro Nashville Police and Fire Departments successfully conspired to frame Claude Garrett for the arson-murder of Lorie Lance.[1] Cooper and his co-conspirators planted physical evidence, knowingly contaminated evidence samples, and made overt efforts to conceal their misdeeds. Cooper fabricated findings from his investigation in his report, and, as an expert in fire science, lied to prosecutors about the significance of test results and other evidence. As a direct result of Cooper's and his co-conspirator's unconstitutional misconduct, Garrett was prosecuted, convicted, and incarcerated more than 28 years for a heinous crime he did not commit.

Defendants Cooper and the United States have filed a motion for summary judgment arguing that (A) Cooper cannot be sued under § 1983 because he was a federal employee at the time of the investigation, (B) Cooper has absolute immunity for his false trial testimony, and (C) the statute of limitations has run on Plaintiff's intentional infliction of emotional distress claim.

Defendants' arguments have no merit. Cooper acted under color of state law because he conducted his investigation under the authority of a search warrant issued by the State of Tennessee. Cooper is also subject to liability under § 1983 because he conspired with state officials to deprive Garrett of his constitutional rights

_____

[1] Plaintiff named several Metro employees as defendants. After engaging in discovery, Plaintiff moved to voluntarily drop some of those defendants. Plaintiff reached a settlement with the remaining Metro Defendants, and they are no longer parties to this lawsuit.

1

during the course of a state-led investigation of a potential violation of state law. Plaintiff's claims against Cooper are based on his pretrial nontestimonial misconduct, for which Cooper does not have absolute immunity. Finally, Plaintiff's IIED claim did not accrue until Garrett's conviction was vacated and the charges against him dismissed, which means that the statute of limitations did not run until after Plaintiff filed the instant lawsuit. Defendants' motion must be denied.

## II. STATEMENT OF FACTS

### A. Initial Investigation

On February 24, 1992, at about 6:00 a.m., Metro Police Detective David Miller was dispatched to the Garrett residence in response to a fire. Upon his arrival at the scene, Miller learned that firefighter Oddis Jenkins found Lorie Lance in the utility room of the home. He was also told that firefighters Terry Nickens and Patrick Hunt carried Lance outside. Lance was taken to Donelson Hospital and pronounced deceased at 6:36 a.m. Claude Garrett, the other individual in the residence, was also transported to the hospital for treatment. (Plaintiff's Statement of Additional Material Facts ("SAMF") ¶¶ 1–4).

Kenneth Porter, an arson investigator with the Metro Fire Department, performed a "pre-investigation" at the scene. Porter smelled kerosene in the residence, which became stronger as he moved toward the back of the kitchen. Porter observed the remains of a plastic five-gallon kerosene cannister between the refrigerator and the utility room door. There is no indication in Porter's report that

he observed or was made aware that Garrett and Lance used a kerosene heater to heat the home. (SAMF ¶¶ 5–9).

Firefighters removed debris and hosed off the floor in the front room of the house. Porter observed what he described in his report as a "very large pour pattern" on the floor, extending from the front double windows to the front door and towards the kitchen. Porter believed the pour pattern "suggested that a possible mixed liquid accelerant was used to create a very hot and fast burning fire." Porter conveyed this information to police. (SAMF ¶¶ 10–11).

Detective Miller asked Porter to collect and process physical evidence. Porter collected several samples of the carpet, subfloor, and soil from the crawlspace at the point of origin of the fire. Porter submitted the samples to the Tennessee Bureau of Investigation for testing. All of Porter's floor samples tested negative for the presence of kerosene or petroleum distillate. At his deposition in this lawsuit, Porter testified that the negative result of his test samples would affect his determination that an accelerant was used and, depending on the remainder of his investigation, could lead him to identify the cause of the fire as "undetermined." (SAMF ¶¶ 12–17).

In the morning and early afternoon on the day of the fire, Metro Police Officer James Goodman photographed the scene. A photograph of the side of the refrigerator taken by Goodman does not depict a bedspread lying in front of the refrigerator. A photograph taken from nearly the exact same vantage point on March 3 clearly shows a bulky bedspread lying on the floor in front of the refrigerator. Additionally, on the morning of February 24, Goodman took a photograph of the front living room and

3

double windows on the west (front-facing) side of the home. That photograph does not depict debris or the remains of a cardboard box along the west wall two feet from the south wall. (SAMF ¶¶ 24–29).

Goodman and Porter each prepared a diagram of the scene. Neither diagram depicts the presence of a "kerosene-soaked" bedspread in front of the refrigerator in the kitchen. Both Goodman and Porter testified at Claude Garrett's second criminal trial that they would have included the bedspread in their diagrams if they had observed it. (SAMF ¶¶ 19–23).

Detective Michael Roland viewed Lori Lance's body at the hospital and observed that apart from her burn injuries, she did not appear to have suffered from any physical trauma. The autopsy performed later that morning confirmed that Lance did not suffer from any injuries indicative of having been in a struggle. Lance suffered first and second degree burns, including second degree burns to the back of her left hand, forehead, and nose. Lance died from smoke inhalation and carbon monoxide poisoning. (SAMF ¶¶ 30–31).

Claude Garrett was diagnosed with second degree burns to the forehead, left biceps, and back of the left hand. He suffered partial skin loss over the joints of his third, fourth, and fifth digits. His left hand was cleaned, debrided and wrapped. Photographs of Lance's and Garrett's burn injuries show them to be strikingly similar in location, degree, and appearance. (SAMF ¶¶ 32–33, 184).

Garrett agreed to accompany police to the homicide office to give an interview. In summary, Garrett told Detective Roland that he and Lance had been out the night

before at a bar called Daisy Mae's. Upon their return home, Garrett and Lance fell asleep on the couch, watching T.V. At some point Garrett woke up, and he and Lance moved to their bedroom. Later, something woke Garrett up. He realized there was a fire in the house, grabbed Lance's hand, and headed toward the front door. As Garrett approached the door, "it was getting hot." Lance broke away from him and turned toward the back of the house. Garrett exited the residence, and flames started rolling out the front door. Garrett told police that he did not know what started the fire. He also stated that he told firemen at the scene to go to the back of the house because he thought Lance went that way to escape the fire. (SAMF ¶¶ 35–39).

Garrett further cooperated with the investigation by consenting to having his blood drawn, sitting for a polygraph examination, and turning his clothes over to investigators. Garrett's pants and shirt tested negative for the presence of kerosene or petroleum distillate. (SAMF ¶ 42).

Detective Miller interviewed two individuals who worked at Daisy Mae's. Both employees confirmed that Garrett and Lance had been in the bar the night before, and neither of them observed any conflict between the two. Detective Roland interviewed Stacy Floyd, Garrett and Lance's next door neighbor. Floyd told Roland that she observed Lance and Garrett arriving home between 3:00 and 3:30 a.m., and that she did not hear them arguing. (SAMF ¶¶ 40–41).

On the day of the fire, Detective Miller interviewed Oddis Jenkins. According to Miller's report, Jenkins told him that as best he could remember, the door to the utility room was <u>not</u> locked. Although Jenkins agreed that the status of the lock was

significant in determining how Lance's death occurred, he never prepared an incident report or documented in writing that the door leading into the utility room was allegedly locked during the fire. (SAMF ¶¶ 45, 47).

Firefighter Patrick Hunt prepared an incident report on the day of the fire. On February 27, Hunt and his fellow firefighter, Terry Nickens, gave formal statements to Detective Miller. Although Jenkins would testify later that he told firefighters <u>at the scene</u> that the door to the utility room was locked, neither Hunt's incident report, Hunt's statement, nor Nickens's statement indicate any knowledge that the door to the utility room was locked before Lance was located. (SAMF ¶¶ 46, 48–49).

### B. Cooper Joins the Investigation

At some point on February 24, Detective Miller called Defendant James Cooper to assist with the investigation. Miller and Cooper knew each other through having worked on another case together, and because their sons played on the same baseball team. Miller believed that Cooper had expertise in fire investigation based on prior general conversation between the two. When asked at his deposition why he did not rely on Kenneth Porter's investigation, Miller testified that Porter "was probably busy" and that Cooper "could assist him better." (SAMF ¶¶ 50–52).

Cooper only participated in the investigation because the Metro Police Department requested assistance. Cooper had to request permission from his supervisor at the ATF before investigating the fire because it involved a potential violation of state, not federal, law. Cooper confirmed prior to Garrett's second

6

criminal trial that his investigation was on behalf of the State of Tennessee and not the federal government. (SAMF ¶ 53).

Cooper entered the residence to conduct his investigation pursuant to a warrant issued by the Metropolitan General Sessions Court of Davidson County. The warrant commanded the Metro Police Department—not the ATF or any other federal agency—to process the scene and seize evidence. Cooper was never alone at the scene, and he conducted his investigation jointly with Metro. The Metro Detectives and, ultimately, the District Attorney's Office, completely relied on Cooper's expertise to determine whether the fire was an arson. (SAMF ¶¶ 54–55).

On February 24, 1992, at approximately 6:20 p.m., Defendant Cooper, Detective Miller, Detective Roland, and D.A. Investigator Regina West walked through the Garrett residence. The house, including the kitchen, was filled with standing water. Defendant Cooper purportedly "tripped" over a bedspread lying in front of the refrigerator, adjacent to the utility room. Although Cooper claimed to have "tripped" over the bedspread, Detective Miller's evidence control log indicates that Regina West found it. West has no memory of locating the bedspread, and she did not document in her report that she located the bedspread. (SAMF ¶¶ 56–62).

Cooper located the five-gallon kerosene container within two feet of the bedspread. Cooper observed that the top of the container had collapsed and had holes in it. Cooper also identified what he thought was kerosene resting on top of the container. Cooper later testified at Garrett's trial that when he picked up the container, liquid was "squirting" out of it. (SAMF ¶¶ 63–65).

Cooper took a sample of the bedspread by cutting off a piece of it. He obtained a sample of the liquid from the five-gallon plastic container. Cooper also collected a "baseboard" sample from the living room. The baseboard sample was obtained from the baseboard along the front wall under the front window, approximately two feet from the south wall. Cooper purportedly obtained the sample by "digging in the cracks and the grooves and actually taking a piece of the baseboard[.]" The sample Cooper collected included debris and "remains of a cardboard box" supposedly lying under the front window. Finally, Cooper collected a smoke alarm that was sitting on the dryer in the utility room. The samples from the bedspread, kerosene container, and baseboard all tested positive for a kerosene range distillate. The smoke detector also tested positive for the presence of kerosene range distillate. (SAMF ¶¶ 66–73).

Cooper issued a less than two-page report pertaining to his investigation and conclusions. In summary, Cooper stated in the report that the fire originated in the living room. Cooper observed a pour pattern "consistent with a liquid accelerant being used on the living room floor." Cooper wrote that a bed covering "soaked with an accelerant" was found on the floor near the refrigerator. Cooper concluded that the fire was incendiary and that the arsonist intended to spread the fire from the living room to the kitchen and utility room. (SAMF ¶¶ 75).

Cooper's report makes no mention of interviewing any firefighters or examining the locking mechanism to the utility room door. The report does not state that Lance was found by firefighters locked in the utility room. The report does not document the possibility that any of the samples were contaminated by the leaking

kerosene container, or due to Cooper handling the container and the evidence samples while wearing the same gloves. (SAMF ¶¶ 76–78).

### C. Video Walkthrough of the Scene

During discovery in this lawsuit, a video-recorded walkthrough of the scene was located by the parties in the District Attorney's file. The date stamp on the video is February 27, 1992. The video includes a close-up of the locking mechanism on the utility room door, and it also depicts the bedspread sitting in front of the refrigerator in the kitchen. (SAMF ¶¶ 79–81). Defendant Cooper, Detective Miller, Detective Roland, and Regina West all denied shooting the video or having any knowledge of it. According to Detective Miller's report, he interviewed Garrett's next door neighbors at their residence the morning of February 27, 1992. (SAMF ¶¶ 82–83).

Assistant District Attorney John Zimmerman, who represented the State of Tennessee at Garrett's first trial, testified in his deposition that he has no memory of the video and, had he been aware of it, he probably would have used parts of it at Garrett's criminal trial. The prosecution did not disclose the video nor the fact that a video of the scene was taken to Garrett's criminal defense attorney before Garrett's second trial.[2] The video also was not admitted as an exhibit at either of Garrett's trials. (SAMF ¶¶ 84–86).

### D. The Desmond Carter Letter

A letter dated March 27, 1992, signed by Lieutenant Desmond Carter, was sent to Metro Fire Chief Bill Hampton. The letter enclosed the diagram of the Garrett

---

[2] The attorney who represented Garrett at his first criminal trial is deceased.

residence prepared by Kenneth Porter. Detectives Miller and Roland drafted the letter and asked Carter to sign it. The letter identifies "discrepancies" in Porter's diagram that "needs [*sic*] to be corrected or discussed" before the diagram was to be placed in the homicide case file. Among the listed discrepancies were the location of the origin of the fire, and that Porter's diagram failed to depict the bedspread in front of the refrigerator. (SAMF ¶¶ 87–89, 93).

The letter was not produced to the prosecution before Garrett's first trial. ADAG Zimmerman testified in his deposition that he viewed the letter as exculpatory, and he would have disclosed it to the defense had he possessed it. Porter testified at his deposition that it was inappropriate for someone to ask him to alter his diagram, and, in his opinion, the letter was "trying to cause me to lie." (SAMF ¶¶ 90–91, 94–95, 138).

### E. The Prosecution's Reliance on Metro PD and Cooper

ADAG Zimmerman relied on the investigation performed by law enforcement in deciding whether to charge Garrett. He trusted law enforcement to give him truthful information, and he would never knowingly elicit false testimony from a witness during trial. Zimmerman had no expertise in arson, and he relied on Cooper's expertise in prosecuting Garrett. He never would have called Cooper to testify at Garrett's trial if he knew that Cooper fabricated evidence or lied about the fire being an arson. Zimmerman also expected Cooper to tell him if there was a possibility that the evidence Cooper collected had been contaminated. (SAMF ¶¶ 96–100).

Cooper, Detective Miller, and Detective Roland met with Zimmerman and did a walkthrough of the scene before the case was presented to the grand jury, during which Cooper explained to Zimmerman his investigation and conclusion. Zimmerman also received a copy of Cooper's two-page report. Cooper spoke with Zimmerman "several times," during which he explained the significance of the bedspread. Zimmerman also testified that any information he elicited from a witness <u>at trial</u> was based on a report, statement, or information given to him by the witness <u>prior to</u> trial. (SAMF ¶¶ 101–07).

### F. Evidence Elicited at Garrett's Trials

The prosecution's evidence at Garrett's trials focused primarily on (1) the irregular burn pattern on the living room floor, which Cooper described as a "pour pattern;" (2) the bedspread, which Cooper testified was "saturated" with kerosene, and the (3) baseboard sample, which also tested positive for kerosene. (SAMF ¶¶ 115–17, 143–44, 150–52). Cooper testified that the bedspread was "dripping" with so much kerosene that law enforcement "took it outside and threw it outside after the sample was obtained." (SAMF ¶ 118) Cooper also testified he knew that the kerosene on the bedspread could not have come from the kerosene cannister "because there was so much kerosene on it." (SAMF ¶ 121, 147). Cooper testified at both trials that the fire was intentionally started with the use of an accelerant, and that the bedspread was used to spread the fire from the front to the back of the house. (SAMF ¶¶ 122, 152). Cooper's report was admitted into evidence at both trials. (SAMF ¶¶ 128, 153).

11

The prosecution elicited testimony at Garrett's trials that was not included in any written report. Cooper testified at Garrett's first trial that an arsonist will often sustain burn injuries from igniting an accelerant, *i.e.*, the person is burned "from a flash that comes back at you." Cooper testified that "you need to look at" a person who, like Garrett, sustained signed eyebrows and facial hair and burns to their hands. (SAMF ¶¶ 125–26). In a similar vein, Detective Miller testified at both trials that Garrett refused to submit to a swab of his hands. (SAMF ¶ 111, 141).

The prosecution elicited a substantial amount of evidence about steps that were taken to prevent contamination during evidence collection. Cooper testified at both trials that he wore latex gloves, which he changed between handling different items of evidence. (SAMF ¶¶ 112, 148). Detective Miller testified at Garrett's second trial that he and Cooper both changed gloves for each item of evidence. (SAMF ¶ 142).

To the surprise of the defense at the first trial, Oddis Jenkins testified that when he encountered the utility room door, it was locked. Although Jenkins did not have "perfect recall" of the type of latch on the door, he testified that he had to "turn and move a knob to get the door open." Jenkins later conceded that there was no knob on the door. (SAMF ¶¶ 130–33). Jenkins testified at the second trial that through either "turning or sliding" or "whatever procedure," he unlocked the door and went inside. (SAMF ¶ 154). The firefighters consistently testified that visibility in the house was poor at the time they located the utility room door; Jenkins's mask was fogged up, and due to smoke, the firefighters could only see about the width of a hand in front of their faces. (SAMF ¶¶ 131, 134).

12

At Garrett's first criminal trial, Cooper testified that he did not interview any firefighters. Cooper testified that he "thought" the door was locked, but the best person to answer that question would be the fireman who made entry into the room. (SAMF ¶¶ 123–24). After Garrett's conviction was vacated, Cooper testified that he interviewed Jenkins at the scene. Cooper testified in detail about how Jenkins described using two hands to slide the bolt on the latch to the other side of the door. (SAMF ¶¶ 157–58).

Garrett was convicted by a jury of first degree murder after his first trial and sentenced to life imprisonment. (SAMF ¶ 135). Garrett filed a postconviction petition. The petition alleged that the prosecution committed a Brady violation where it failed to disclose Detective Miller's report, in which Miller documented that Jenkins told him the door to the utility room was <u>not</u> locked. The petition also alleged that the prosecution committed a Brady violation based on its failure to disclose the Carter letter with Porter's enclosed diagram. (SAMF ¶ 137). The lower court denied relief, but the appellate court reversed and vacated Garrett's conviction. (SAMF ¶ 139). A jury convicted Garrett of first degree murder after his retrial, and he was again sentenced to life imprisonment. (SAMF ¶ 162).

### G. CRU Report, Conviction Vacated, and Charges Dismissed

On November 22, 2021, the District Attorney General, through its Conviction Review Unit ("CRU"), filed a "Notice of Intent" with respect to Garrett. The Notice stated the following:

13

> This Office knows of clear and convincing evidence of [*sic*] creating a reasonable likelihood that Mr. Garrett did not commit the offense of which he was convicted.

(SAMF ¶ 165). The Notice incorporated the CRU's report, which states, "Holistic review of the record, the District Attorney's file, and new scientific evidence dismantles every single piece of evidence previously believed to inculpate Garrett." (SAMF ¶ 166).

The CRU report includes a scathing critique of Cooper's investigation. The report indicates, "Comprehensive review of the evidence and analysis by multiple fire investigation experts reveal Cooper's investigation to be faulty, his methods outdated, and his conclusions unsubstantiated." The report described Cooper's testimony at the second trial as "emotionally charged, filled with inflammatory overstatements, mischaracterizations of the evidence, and assumptions regarding Garrett's state of mind." The report noted that Cooper "consistently declined to provide any rationale for his boldest statements, failed to preserve crucial evidence, and filed a meager two-page report that has stymied more rigorous review of his methods and thought processes." (SAMF ¶¶ 167–69).

The report took issue with all the evidence collected by Cooper. The CRU noted that Cooper failed to properly document the integrity of the kerosene cannister found in the kitchen. It determined that Cooper's description of the bedspread being saturated with kerosene was unsupported because (a) he only collected a portion of it, (b) the testing instruments would have returned positive with as little as 1/10 of a single drop of kerosene, and (c) no analysis exists for "saturation." The CRU pointed

14

out that even if the bedspread was "saturated" with kerosene, the bedspread did not incriminate Garrett because the kerosene could have come from the leaky kerosene cannister. Finally, the CRU stated, "There is also no reason to believe that the bedspread was in the kitchen during the fire itself" based on its absence from Goodman's and Porter's diagrams. (SAMF ¶¶ 172–76).

As to the baseboard sample, the CRU questioned how the sample "included cardboard collected from a room that had reached at least 1,100 [degrees] Fahrenheit." It also criticized Cooper's failure to acknowledge that the positive test result was unreliable since ignitable liquid could have mixed with the standing water found throughout the residence. (SAMF ¶¶ 170–71).

The CRU found it "inexplicable" that Cooper and Detective Miller failed to preserve the latch to the utility room door and photographed it "minimally, if at all." The CRU pointed out that Jenkins's testimony about the lock was unreliable based on the circumstances under which he encountered the door, while the latch could have been examined or tested to determine its position during the fire. The CRU characterized Cooper's evolving testimony about whether he interviewed Jenkins as "troubling." (SAMF ¶¶ 179–82).

The CRU concluded, "When stripped of demonstrably unreliable testimony, faulty investigative methods, and baseless speculation . . . the case against Garrett is nonexistent." (SAMF ¶ 185).

On May 6, 2022, the Criminal Court for Davidson County, Tennessee, entered an order reopening Garrett's postconviction proceedings and vacating his conviction.

The Court held that Garrett established a freestanding claim of actual innocence based on new scientific evidence. Because Garrett's conviction was based on unreliable and false scientific evidence, Garrett's conviction violated due process. On May 10, 2022, the charges against Garrett were dismissed. (SAMF ¶¶ 186–87).

### H. Evidence of Conspiracy to Deprive Constitutional Rights

Viewed in a light most favorable to Plaintiff, the evidence establishes that Cooper conspired, at a minimum, with Miller and Roland to fabricate the criminal case against Garrett from stem to stern.

The most obvious evidence of fabrication consists of Cooper, Miller, and Roland planting physical evidence to support their theory of arson, including the bedspread "saturated" with kerosene in front of the refrigerator. A photograph of the refrigerator taken earlier in the day before Cooper's walkthrough of the scene does not depict the bedspread. Neither Goodman's nor Porter's diagrams of the scene depict the bedspread, and both later testified that they would have included the bedspread in their diagrams if they had observed it. To further advance the conspiracy, Miller and Roland drafted a letter that was sent to the Metro Fire Department, encouraging Porter to alter his diagram before it was placed in the homicide case file. Though Miller and Roland may try to put a neutral spin on the letter, their failure to disclose it to the prosecutor supports an inference that its purpose was to conceal evidence that the bedspread was planted.

Similarly, there is evidence that Cooper planted cardboard in the baseboard sample. A photograph taken by Goodman earlier in the day does not show the remains

16

of any cardboard (or debris, for that matter) in the location from which the baseboard sample was obtained. As noted by the CRU, cardboard would not have survived in the living room, which reached at least 1,100 degrees Fahrenheit during the fire. Miller and Roland were present when the sample was collected, and a reasonable trier of fact could find that they were complicit in Cooper's misconduct.

The evidence shows that Cooper fabricated evidence, *i.e.*, he lied to the prosecutor, when he informed the prosecutor before trial that Garrett could have sustained his injuries from "flashback." The air temperature on the night of the fire was 50 degrees Fahrenheit with 93% humidity. The flashpoint of kerosene is approximately 100 degrees Fahrenheit.[3] Unlike gasoline, the compounds in kerosene have a very low vapor pressure and do not easily form vapors. In other words, as Cooper admitted in his deposition, kerosene is not easy to ignite. (SAMF ¶ 127). Any attempt to ignite kerosene under the atmospheric conditions present on the night of the fire would not have caused Garrett's burn injuries. (SAMF ¶¶ 201–03).

Similarly, a reasonable trier of fact could find that Miller fabricated evidence when he told the prosecutor before trial that Garrett refused to give a hand swab. Garrett fully cooperated with the investigation by giving a blood sample, allowing police to collect his clothing, sitting for an interview, and consenting to a polygraph. Miller's report does not document that Garrett refused to give a hand swab, and Miller and Roland both testified in their depositions that the refusal to give a hand

---

[3] A flashpoint is "the lowest temperature at which vapors above a volatile combustible substance ignite in air when exposed to flame. "flashpoint." Merriam-Webster.com, 2025, https://www.merriam-webster.com (June 18, 2025).

17

swab should be documented in a report. Moreover, Miller could not explain how he would have obtained a swab from Garrett given that his left hand was wrapped in gauze. (SAMF ¶¶ 43–44).

There is also evidence to create a triable issue of fact that Cooper knowingly contaminated the samples he collected by wearing the same gloves when handling different pieces of evidence. Cooper testified at trial that he wore disposable latex gloves which he changed between handling different samples. Incredibly, Cooper admitted during his deposition that he was allergic to latex as of 1992 and did not wear latex gloves when conducting investigations. Moreover, Cooper identified a photograph of his hand at the scene in which he was wearing a non-disposable utility glove. (SAMF ¶¶ 113–14). The most plausible explanation for the smoke alarm testing positive for a kerosene range distillate is that Cooper handled multiple samples wearing the same gloves.[4] Miller participated in concealing the contamination when he, too, falsely testified at Garrett's retrial that Cooper changed gloves between handling pieces of evidence. (SAMF ¶142).

More fundamentally, any fire investigator with Cooper's experience, training, and expertise would have known in 1992 that due to its low volatility and relatively high flashpoint, it would have been impossible to ignite kerosene poured out on the floor given the ambient air temperature on the night of the fire. Thus, not only could

[4] The CRU—which did not know that Cooper lied about wearing latex gloves at trial—described the presence of kerosene on the smoke alarm as a "confounding piece of evidence." It presciently opined that "scene contamination" was a reasonable hypothesis to explain the positive result. *See* Ex. EEE, CRU Report, MG8933–8934.

18

the ignition of kerosene not have caused Garrett's burn injuries, but kerosene was also not used to start the fire at the residence. (SAMF ¶¶ 197–98).

Furthermore, any fire investigator with Cooper's experience, training, and expertise would have known in 1992 that the samples he collected were contaminated by the leaking kerosene container in the kitchen. Firefighters sprayed thousands of gallons of water on the scene, which left standing water throughout the residence. Kerosene floats on water, and water running over the top, sides, and underneath the container would transfer kerosene throughout the residence. Samples that contacted even trace amounts of kerosene-contaminated water would test positive for kerosene. (SAMF ¶¶ 204–08).

Cooper preemptively circumvented the leaking kerosene container by writing in his report that the bedspread was "saturated" with kerosene, intimating that it could not have come from the cannister. Based on his trial testimony, Cooper's claim appears to have been based on the strong odor of kerosene present in the kitchen. However, any fire investigator in 1992 would have known that odor would not have been a reliable indicator of "saturation." Smell is a function of evaporation rates, and evaporation rates are proportional to surface area. Because kerosene floats and spreads thinly on water, a relatively small amount of kerosene spread over large puddles of water—like those present throughout the Garrett residence—would produce a strong odor. (SAMF ¶¶ 210–12).

Nor can Cooper credibly assert that his claim that the bedspread was "saturated" or "dripping" with kerosene was inadvertent or a mistake. To bolster his

19

claim, Cooper testified at Garrett's trial that the bedspread was so saturated with kerosene that it posed a hazard and had to be removed from the residence. Yet, the video walkthrough of the scene—which was concealed from Garrett during his criminal proceedings—proves Cooper's testimony to be unequivocally false. The video shows that the bedspread remained in the house in front of the refrigerator days after Cooper's investigation at the scene. (SAMF ¶¶ 80–81).

Last, there is also evidence to create a triable issue of fact that Cooper intentionally misled the prosecution concerning the status of the lock on the utility room door. Any fire investigator in 1992—including Cooper by his own admission—knew that the latch could be examined to determine its position at the time of the fire. (SAMF ¶ 222). Yet, Cooper, Miller, and Roland failed to collect it. Cooper then told the prosecutor before Garrett's retrial that he interviewed the firefighters about the status of the lock at the house during his investigation, and that Jenkins told him the door was latched. (SAMF ¶ 140).

The information Cooper gave to the prosecutor about interviewing Jenkins and his testimony to that effect is false. Cooper did not include information from any alleged interviews with firefighters in his report, he testified at Garrett's first trial that he did not interview any firefighters, the firefighters never returned to the scene, and Jenkins denied having been interviewed by Cooper. (SAMF ¶¶ 76–78, 160–62).

Significantly, the video walkthrough of the scene from February 27, 1992, provides the clearest, closest depiction of the latch to the utility room door. Again, the video was not disclosed to Garrett before his criminal trials. The video provides

20

conclusive visual evidence that the latch was in an unlatched (or unlocked) position at the time of the fire. Specifically, there is no shadow over the door where the door would have been protected during the fire if the locking mechanism had been latched. Also, there are clearly visible carbon deposits on the bolt at the right side of the latch barrel, indicating that it was exposed during the fire. (SAMF ¶¶ 224–26).

The evidence is that Miller took the video and, in furtherance of the conspiracy to frame Garrett, did not disclose it to the prosecution. The video was taken by someone with knowledge of the significance of the bedspread and latch. Miller knew the importance of the bedspread and latch based on his previous walkthrough with Cooper. Miller's report indicates that he was right next to the scene on the day the video was shot, interviewing Garrett's neighbors. (SAMF ¶ 83). Given that Cooper, Roland, and West all denied shooting or knowing about the video, it is reasonable to conclude that Miller is the one who took the video and concealed its existence.

## III. Argument

### A. Plaintiff's § 1983 Claims Against Cooper Are Viable Because Cooper Acted Under Color of State Law, and Because He Engaged in a Conspiracy with Metro Detectives to Deprive Garrett of His Constitutional Rights

Defendants argue that because James Cooper was employed as a federal agent for ATF and acted within the scope of his employment, he was not acting under color of state law and therefore cannot be found liable under § 1983. Defendants' argument is a nonstarter.

Notably absent from Defendant's memorandum is any analysis of what it means to act "under color of state law." A defendant in a § 1983 action acts under

color of state law when he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). There is a two-step approach to determining whether deprivation of a federal right may be attributable to the State. *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). First, "the deprivation must be caused by the exercise of some right or privilege created by the State[.]" Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. *Id.* "This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.*

Cooper acted under color of state law during his investigation. Cooper entered Garrett's residence to conduct his investigation pursuant to a warrant issued by the Metropolitan General Sessions Court of Davidson County, which directed the Metro Police Department to process the scene and seize evidence. Absent the warrant issued by a state court and a request for assistance from Metro P.D., Cooper's entry into the home and handling of evidence at a potential crime scene would have been unlawful. Cooper's investigation was therefore predicated on "the exercise of some right or privilege created by the State." Moreover, Cooper performed his investigation with state officials, *i.e.*, Metro Police Detectives Miller and Roland. Cooper therefore acted under color of state law pursuant the two-part definition of state action set forth in *Lugar*. Indeed, Cooper testified before Garrett's second trial that he performed his investigation on behalf of the State of Tennessee and <u>not</u> the federal government.

22

Moreover, well established precedent is that a § 1983 action can lie against federal employees if they conspire or act in concert with state officials to deprive a person of their civil rights under color of state law. *E.g.*, *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 869 (10th Cir. 2016) (federal officials may act under color of state law where they conspire with state officials to infringe a protected constitutional right); *Case v. Milewski*, 327 F.3d 564, (7th Cir. 2003) (same). The Sixth Circuit has joined most circuits in holding that a federal official acts "under color of state law" where they engage in a conspiracy or "symbiotic" venture with state officials to violate a person's constitutional rights. *Strickland v. Shala*, 123 F.3d 863, 866–67 (6th Cir. 1997) (citations omitted).

A civil conspiracy under § 1983 is "an agreement between two or more persons to injury another by unlawful action." *Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015) (citation omitted). To establish a conspiracy, the plaintiff must show that (1) a "single plan" existed, (2) the conspirators "shared in the general conspiratorial objective" to deprive the plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the plaintiff's injury. *Id.* (citing *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). "Plaintiffs are not required to prove an express agreement among all the conspirators, and '[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved.'" *Roberson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Hooks*, 771 F.3d at 944)). Rarely in conspiracy cases will there be direct evidence of an express agreement among all conspirators to conspire. *Webb*, 789 F.3d at 671. Thus, plaintiffs

23

are entitled to rely on circumstantial evidence to establish an agreement among the conspirators to defeat summary judgment. *Id.* (quoting *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012)).

As set forth above, there is ample circumstantial evidence that, at a minimum, Cooper, Miller, and Roland acted pursuant to a plan with a common objective of framing Garrett for murder, and that overt acts were committed in furtherance of the conspiracy. This includes planting physical evidence, contaminating physical evidence, misleading the prosecution as to the significance of TBI test results, and concealing evidence of their misdeeds.

With respect to arguing that Plaintiff lacks sufficient proof of conspiracy to establish a *Bivens* claim—a claim Plaintiff has not asserted—Defendants spin a narrative of events based on disputed facts, critical omissions, and blatant distortions of the record.[5] (Dkt. 141 at 17–22). For example, Defendants claim that Garrett "managed to escape with minor burns." (Dkt. 141 at 17). Nothing could be further from the truth. Garrett suffered severe second-degree burns to his face and left hand with partial skin loss. The CRU and Plaintiff's experts have opined that Garrett's and Lance's burn injuries are strikingly similar and indicate that Lance suffered those injuries at the same time and in the same location as Garrett (*i.e.*, based on the similarity of the injuries, Lance was not locked in the utility room during the fire).

---

[5] The certification of acting United States Attorney Robert McGuire that Cooper was acting in the course and scope of his employment has no bearing on whether Cooper acted under color of state law, because Mr. McGuire does not claim to have personal knowledge of whether Cooper conspired with state actors. (Dkt. 139).

24

The Court can view photographs of the injuries itself to judge whether Defendants' claim that Garrett suffered only "minor" injuries withstands scrutiny. (Ex. GGG).

Defendants claim that Garrett told firefighters that Lance would be in the front room but changed his story and told them to look "in the utility room." (Dkt. 141 at 17). This is not just a disputed fact, it is categorically false. Hunt never documented or testified that Garrett told him Lance was in the utility room. Rather, Hunt testified at trial that when Garrett approached him, Garrett said that he and Lance were in the front of the house, they left the bedroom together, and they got separated. Hunt never believed that Garrett was telling him that he knew where Lance was in the house, and he did not view anything that Garrett said to be incriminating. (See Plt. Resp. to Def. SOMF ¶¶ 4–5). In fact, what Garrett told Hunt is entirely consistent with what he told police later that morning. (SAMF ¶ 36).

Defendants contend that Cooper, Miller, Roland, and West merely walked through the residence and collected evidence. With their proverbial heads in the sand, Defendants argue that Plaintiff has "no evidence whatsoever to support" his claims that the bedspread and cardboard were planted. (Dkt. 141 at 19). This is incorrect, for all the reasons stated above. The absence of the evidence in photographs and diagrams more than raises a fact issue on whether the evidence was planted, as does the impossibility of cardboard being present in the living room during the fire. Miller and Roland's efforts to have Porter alter his diagram to include the bedspread—which efforts they concealed from the prosecutor—is additional evidence of a conspiracy and sounds the death knell to Defendants' unavailing argument.

25

In drive-by fashion, Defendants contend that Garrett's convictions "were founded on probable cause." (Dkt. 141 at 21). Defendants' argument should be deemed waived for failing to develop and support it. *Alston v. City of Detroit Police Officers*, 717 F.Supp.3d 618, 633 (E.D. Mich. 2024) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Defendants do not identify the specific <u>undisputed</u> facts they contend support probable cause, making their argument impossible for Plaintiff to address. Similarly, the United States refused to identify the evidence they claim supported probable cause in response to Plaintiff's interrogatories. (Ex. NNN, ¶ 14). Cooper, meanwhile, denied he contends that probable cause existed. (Ex. OOO, ¶ 22).

Plaintiff has shown disputed issues of fact as to whether virtually every piece of incriminating evidence was fabricated. Probable cause cannot be supported by fabricated evidence. *Clark v. Abdallah*, 131 F.4th 432, 453 (6th Cir. 2025). Moreover, any presumption of probable cause created by an indictment may be overcome upon a showing that the officer has falsified or fabricated evidence in the course of setting a prosecution in motion. *King v. Harwood*, 852 F.3d 568, 589 (6th Cir. 2017); *see also Manuel v. City of Joliet*, 580 U.S. 357, 369 n.8 (2017) ("[I]f the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights[.]")[6]

---

[6] To the extent Defendants could be construed as making a haphazard argument that collateral estoppel precludes Plaintiff from relitigating probable cause or fabrication of evidence based on the criminal proceedings, that argument is easily dispatched. (Dkt. 141 at 23 ("This case is a previously asserted habeas theory packaged as a section 1983 case.")) Not only have Defendants failed to support such an argument

The one piece of evidence that Plaintiff does not dispute existed was the irregular burn pattern in the living room. However, Cooper has admitted that the putative pour pattern alone was insufficient to determine that the fire was an arson. (SAMF ¶ 110). And ADAG Zimmerman testified that he would have had "pause" about proceeding with the case if the only evidence of arson were the alleged pour pattern. (SAMF ¶ 109). Moreover, the existence of probable cause in a § 1983 action with disputed facts is generally a jury question. *Id.* (citing *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020). That holds true in this case.

In a similarly slipshod manner, Defendants make other assertions in their motion that have no bearing on whether triable questions of fact exist. Defendants point out that the CRU did not find the existence of a conspiracy in its report, nor was its director aware of evidence of malicious prosecution. (Dkt. 141 at 20–21). But a finding by the CRU of conspiracy or malicious prosecution is not an essential element of any of Plaintiff's claims. Defendants also contend there is a lack of evidence as to motive for Cooper and the detectives to frame Garrett. (Dkt. 141 at 19–20, n.6). On the contrary, Detective Roland expressed displeasure with the CRU's determination after Garrett's conviction was vacated. In a conversation with the head of the CRU, he made a troubling comment to the effect of, "I would have told you I think that guy's guilty. You could look at his face and tell that he was guilty." (SAMF ¶ 189). Evidently, Cooper and Miller shared that belief to the point that they were

---

with the application of facts to legal precedent, but the Sixth Circuit has decidedly rejected it. *E.g.*, *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) ("[T]he general rule is that a judgment which is vacated . . . has no preclusive effect.") (collecting cases).

willing to fabricate inculpatory evidence, withhold exculpatory evidence, lie to the prosecutor, and commit perjury to ensure Garrett's conviction. Regardless, a plaintiff need only show evidence of deliberate fabrication to prove the requisite mental state under § 1983. *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017). Here, that evidence exists in spades. Defendants' motion must be denied.

## B. COOPER DOES NOT HAVE ABSOLUTE IMMUNITY FOR HIS PRETRIAL NONTESTIMONIAL MISCONDUCT.

Plaintiff does not dispute that Cooper cannot be held liable for giving deliberately false testimony at Garrett's criminal trials. (Dkt. 141 at 24). However, fabrication of evidence is a pretrial, nontestimonial act which is not entitled to absolute immunity. *Gregory v. City of Louisville*, 444 F.3d 725, 740 (6th Cir. 2006). Cooper cannot claim immunity for planting physical evidence and falsifying evidence in his report. *Id.* at 741. This includes the false assertion in his report that a "bed covering soaked with an accelerant was found on the floor near the refrigerator located in the kitchen area."[7]

Cooper also cannot assert absolute immunity for misrepresentations made to the prosecutor before trial. *Id.* at 741–42. "The simple fact that acts may ultimately lead to witness testimony does not serve to cloak those actions with absolute testimonial immunity." *Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir. 1999).

---

[7] Again, Cooper's report contains three deliberate falsehoods with respect to the bedspread: (1) that it was found in front of the refrigerator, (2) it was "soaked" with an accelerant, and (3) it was meant to be used to spread the fire to the back of the house.

28

Thus, an investigator may be held liable for deliberate material misstatements to the prosecutor before trial. *Sykes v. Anderson*, 625 F.3d 294, 314–16 (6th Cir. 2010).

There is ample evidence for a jury to conclude that Cooper made deliberate material misstatements to the prosecutor which led to false testimony at Garrett's trials. ADAG Zimmerman relied entirely on Cooper's expertise in determining whether the fire was an arson. Cooper and Zimmerman spoke about the investigation "several times," including during a walkthrough of the scene. Zimmerman's direct examination of Cooper was based entirely on Cooper's report, statements, or information given to him before trial. Thus, for example, a jury could reasonably conclude that Cooper misled Zimmerman into believing that Garrett could have sustained his injuries via flashback from the ignition of kerosene vapors, even though neither Zimmerman nor Cooper could remember the specifics of their conversations.

In any event, Plaintiff has shown disputed issues of fact regarding numerous pretrial acts for which Cooper may not assert absolute testimonial immunity. Defendants' motion for summary judgment must therefore be denied.

## C. PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IS TIMELY, AND PLAINTIFF HAS DEMONSTRATED TRIABLE ISSUES OF FACT ON THE ELEMENTS OF HER CLAIM.

Defendants argue that the statute of limitations "has long since run" on Plaintiff's intentional infliction of emotional distress claim. Defendants assert that the IIED claim accrued in 1992 when Garrett was arrested and charged. In the alternative, Defendant asserts that Garrett knew as of at least 2013 "that conduct

29

attributable to the government was the cause of his conviction" and that, in any event, equitable tolling should not apply. (Dkt. 141 at 26–29). Defendants are incorrect.

In *Ruff v. Runyon*, 258 F.3d 498 (6th Cir. 2001), the plaintiffs sued several federal employees and the United States for malicious prosecution, abuse of process, and intentional infliction of emotional distress. *Id.* at 500. The lawsuit was based on an investigation conducted by the United States Postal Service targeting postal employees for alleged drug use and trafficking. *Id.* The plaintiffs, although asserting their innocence, initially pled guilty to lesser charges. *Id.* at 499–500. A few years later, the plaintiffs successfully filed motions to withdraw their pleas after learning that their indictments were based on false information provided to the grand jury. *Id.*

The defendants filed motions to dismiss, contending that the plaintiffs' claims were barred by Ohio's two-year statute of limitations. *Id.* at 500. The defendants argued that the plaintiffs' claims accrued in 1991, when the plaintiffs were indicted, or at the latest, when the plaintiffs filed motions to withdraw their guilty pleas. *Id.* The defendants argued that because the plaintiffs did not file suit within two years of either of those accrual dates, the statute of limitations barred the plaintiffs' claims. *Id.* The district court accepted the argument and dismissed the plaintiffs' claims against the individual defendants. *Id.*

The Sixth Circuit reversed the district court's decision. The court noted that the question of when the statute of limitations begins to run is determined by federal law. *Id.* Under federal law, the statute begins to run when plaintiffs knew or should have known of the injury which forms the basis of their claims. *Id.* The inquiry focuses

30

on the harm, rather than the plaintiff's knowledge of the facts that gave rise to the harm. *Id.* A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence. *Id.*

However, the Sixth Circuit rejected the proposition that the statute began to run prior to the date that the underlying criminal charges were dismissed. *Id.* at 501–02. The court's ruling was premised on the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), in which the Court held that § 1983 actions are inappropriate vehicles for challenging the validity of outstanding criminal judgments. *Id.* at 501 (citing *Heck*, 512 U.S. at 486). Thus, to protect against collateral attack on pending or outstanding state convictions or sentences, the Supreme Court held as follows:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by action whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ... or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* (quoting *Heck*, 512 U.S. at 486). Relying on *Heck*, the Sixth Circuit held that a cause of action that would impugn the validity or future of an outstanding criminal conviction does not accrue until the criminal prosecution reaches final disposition. *Id.* at 501–02 (citing *Shamaeizadeh v. Cunigan*, 182 F.3d 391 (6th Cir. 1999), *cert denied*, 528 U.S. 1021). This applies not only to actions that directly challenge wrongful incarceration but also challenge procedures that necessarily imply unlawful confinement. *Edwards v. Balisok*, 520 U.S. 641, 648 (1997).

31

Although state law determines whether there is an underlying cause of action, federal law defines the limitations period and when the cause of action accrued. *Chomic v. United States*, 377 F.3d 607, 611 (6th Cir. 2004) (citing *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991)). Thus, the *Heck* bar applies to causes of action against the United States under the FTCA that would impugn a conviction under state law. *Hinton v. United States*, 91 Fed. Appx. 491, 492–93 (6th Cir. 2004). This includes claims for IIED. *E.g.*, *Flint v. United States*, No. 22-13112, 2024 WL 497059, at *2 (E.D. Mich. 2024) (holding that *Heck* barred a civil claim for intentional infliction of emotional distress predicated on fabricated evidence where the criminal judgment remained in effect).

Plaintiff's claims for intentional infliction of emotional distress are rooted in Cooper's fabrication of evidence, withholding of exculpatory evidence, conspiracy to deprive Plaintiff of his constitutional rights, and misdirection of the prosecution against Garrett. As several courts have held, an IIED claim based on such acts would undermine a criminal conviction and, therefore, the cause of action does not accrue until the conviction or sentence has been invalidated. *E.g.*, *Fisher v. City of Chillicothe*, No. 2:24-cv-2854, 2025 WL 552873, *4 (S.D. Ohio Feb. 19, 2025) (*Heck* bars claims predicated on the fabrication of evidence); *Baker v. City of Chicago*, 483 F. Supp. 3d 543, 560 (N.D. Ill. Aug. 31, 2020) (collecting cases) (holding that the statute of limitations on an IIED claim based on misconduct leading to a wrongful conviction does not begin to run until the conviction has been overturned). Thus, the statute of limitations on Plaintiff's IIED claim did not begin to run until Garrett's

conviction was vacated and the charges against him dismissed on May 10, 2023. *Ruff*, 258 F.3d at 501–02 (*Heck* bar applies until disposition of pending charges).

Defendants also argue that Plaintiff cannot show that Cooper's conduct was intentional or outrageous. Their argument is predicated mostly on the fact that "these are high standards of conduct" and incorrect assertion that "there is no evidence in this record that SA Cooper acted "intentionally" to wrongfully incarcerate Garrett." (Dkt. 141 at 29–30).

For all the reasons set forth in the Statement of Facts (H) and Argument (A) above, Plaintiff has demonstrated triable issues of fact on whether Cooper acted with the requisite mental state required to establish IIED. Certainly, planting physical evidence to support Garrett's conviction would qualify as an "intentional" act. Similarly, Cooper lying to the prosecutor before Garrett's retrial that he had interviewed Jenkins and Jenkins told him the door was latched (or locked) to fortify the prosecution's case would also qualify as intentional misconduct sufficient to support an IIED claim. (SAMF ¶ 140).

Moreover, as even Defendants acknowledge, an IIED claim under Tennessee law can be based on reckless conduct. *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 502–03 (Tenn. 2012). Reckless conduct occurs "when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Id.* (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 910 (Tenn. 1992)). Plaintiff can prove that Cooper

knew, based on his experience as a fire investigator, that his samples were contaminated, and yet nevertheless informed the prosecutor that the positive test results obtained from those samples indicated arson.[8] A reasonable inference to draw from such evidence is that Cooper acted with reckless disregard of the probability that his outrageous conduct would not only cause Garrett's prosecution and conviction, but also inflict severe emotional distress.

In conclusory fashion, Defendants argue that Cooper's conduct was not sufficiently outrageous for a jury to find intentional infliction of emotional distress. Again, Defendants do not cite any precedent to support their assertion, apart from case law that holds outrageous conduct is a high bar under Tennessee law. (Dkt. 141 at 30–31). However, many courts have held that fabricating evidence and/or framing an innocent person for a crime they did not commit is sufficient for a jury to find IIED, even in states that require, for example, conduct that is more than tortious or criminal. *E.g.*, *Bazinet v. Thorpe*, 190 F. Supp. 3d 229, 240–41 (D. Mass. June 3, 2016) (framing an innocent person for a criminal offense is sufficient to meet the high

---

[8] Plaintiff has set forth this evidence *ad nauseum* above. However, because Defendants insist on claiming that "not a shred of evidence" of misconduct exists, Plaintiff reiterates that Cooper has admitted in his deposition that the positive test results could have occurred from kerosene leaking out of the kerosene container. (*See* Ex. BB, Cooper Dep., 124:10–15; *see also* SAMF ¶ 171). Moreover, Plaintiff's expert has testified that any investigator with Cooper's experience, training, and expertise would have known that this his samples were contaminated by the combination of (1) the leaky kerosene container, and (2) water being sprayed over and around that container and throughout the house during the fire. (SAMF ¶¶ 204–08). Defendants may dispute this evidence at trial, but they cannot ignore it for purposes of summary judgment. *E.g.*, *York v. Biskup*, 92 F.3d 1186, (6th Cir. 1996) (at summary judgment, the district court must view the facts in the light most favorable to the plaintiff and resolve all reasonable inferences in her favor).

standard for an IIED claim); *Pitt v. District of Columbia*, 491 F.3d 494, 505–06 (D.C. Cir. 2007) (tampering with evidence to connect plaintiff to the scene of the robbery sufficient to support IIED verdict); *Limone v. United States*, 579 F.3d 79, 94–99 (1st Cir. 2009) (FBI's framing of plaintiffs and scramble to cover up frame job sufficient to find IIED); *Walker v. White*, No. 16-cv-7024, 2021 WL 1058096 (N.D. Ill. Mar. 19, 2021) ("Framing someone for multiple felonies by planting drugs on him and lying under oath at trial is outrageous conduct that a civilized society would find utterly intolerable."). The same holds true in this district. *Stacy v. Clarksville Police Dept.*, No. 3:24-cv-470, 2025 WL 880149, *8 (M.D. Tenn. Mar. 21, 2025) (citing *Raspberry v. Thompson*, No. 12-1209, 2015 WL 1393385, *11–12 (W.D. Tenn. Mar. 25, 2015)) (defendant's use of law enforcement authority to purposefully bring fantom charges against an innocent citizen that has no basis in the law sufficient to support IIED claim)). Defendants' assertion to the contrary must be rejected.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that Defendant United States and James Cooper's Motion for Summary Judgment be denied.

Respectfully submitted,

Date: July 2, 2025

/s/ Nicholas Curran
Nicholas Curran, #6291493
*Admitted Pro Hac Vice*
Kathleen T. Zellner, #6184574
*Admitted Pro Hac Vice*
Kathleen T. Zellner & Associates, P.C.
2001 Butterfield Road, Suite 1025
(Ph) (630) 955-1212
(E) nick@zellnerlawoffices.com

35

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2025, I filed the foregoing **Plaintiff's Memorandum in Support of her Response in Opposition to Defendant United States and James Cooper's Motion for Summary Judgment** via the Court's electronic filing system, which will serve the following parties of record:

Anica C. Jones
Kimberly S. Viers
United States Attorney's Office
719 Church Street, Suite 3000
Nashville, TN 37203

Peter J. Strianse
Tune, Entrekin & White, P.C.
500 11th Avenue North, Suite 600
Nashville, TN 37203


/s/ Nicholas Curran
Nicholas Curran

36

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

DEANA WATSON, as Independent
Administrator of the Estate of CLAUDE
GARRETT, Deceased,

        Plaintiff,

    v.

Current and/or Former ATF Agent JAMES
COOPER, and THE UNITED STATES OF
AMERICA,

        Defendants.

Case No. 23–cv–00456

Honorable Eli Richardson,
Judge Presiding.

Magistrate Judge Jefferey S.
Frensley

## Index to Exhibits

Exhibit A .......... David Miller's supplemental report ("Miller Report")
Exhibit B .......... Michael Roland's testimony at first criminal trial ("Roland TT1")
Exhibit C .......... Kenneth Porter testimony prior to second criminal trial
Exhibit D .......... Kenneth Porter's report ("Porter Report")
Exhibit E .......... Kenneth Porter's testimony at second criminal trial ("Porter TT2")
Exhibit F .......... Porter Request for Examination
Exhibit G .......... Results re Porter Samples
Exhibit H ......... Porter Diagram
Exhibit I ........... James Goodman's testimony at second criminal trial ("Goodman
           TT2")
Exhibit J .......... Goodman Diagram
Exhibit K .......... Goodman Photograph of Refrigerator
Exhibit L .......... David Miller's testimony at second criminal trial ("Miller TT2")
Exhibit M ......... Photographs Dated 3.5.92
Exhibit N .......... Goodman Photograph of West Wall
Exhibit O .......... Photograph of West Wall
Exhibit P ......... Detective Roland's supplemental report ("Roland Report")
Exhibit Q.......... Dr. Gretal Harlan's testimony at Garrett's first criminal trial
           ("Harlan TT1")
Exhibit R.......... Autopsy Report
Exhibit S .......... Garrett ER Records
Exhibit T .......... Garrett Statement
Exhibit U.......... Results re Cooper Samples
Exhibit V.......... Hunt Incident Report

Exhibit W ......... Deposition of Oddis Jenkins ("Jenkins Dep.")
Exhibit X .......... Hunt Statement
Exhibit Y .......... Nickens Statement
Exhibit Z .......... Deposition of David Miller ("Miller Dep.")
Exhibit AA ....... James Cooper's testimony prior to second criminal trial ("Cooper
             pre-TT2")
Exhibit BB ....... Deposition of James Cooper ("Cooper Dep.")
Exhibit CC ....... Search Warrant
Exhibit DD ....... Deposition of Michael Roland ("Roland Dep.")
Exhibit EE ....... Deposition of Regina Beene (nee West) ("Beene Dep.")
Exhibit FF ........ James Cooper's testimony at first criminal trial ("Cooper TT1")
Exhibit GG ....... James Cooper's testimony at second criminal trial ("Cooper TT2")
Exhibit HH ...... Evidence Control Log
Exhibit II .......... Photograph of Kerosene Container
Exhibit JJ ........ Cooper Report
Exhibit KK ....... Scene Video (hard copy filed with clerk)
Exhibit LL ........ letter signed by Desmond Carter ("Carter Letter")
Exhibit MM ...... Deposition of Desmond Carter ("Carter Dep.")
Exhibit NN ....... Deposition of John Zimmerman ("Zimmerman Dep.")
Exhibit OO ....... Photograph of Utility Glove
Exhibit PP ........ Patrick Hunt's testimony at first criminal trial ("Hunt TT1")
Exhibit QQ ....... Oddis Jenkins testimony at first criminal trial ("Jenkins TT1")
Exhibit RR ....... Terry Nickens's testimony at first criminal trial
Exhibit SS ........ TCCA Opinion
Exhibit TT ........ Court Minutes and Judgment
Exhibit UU ....... Petition for Postconviction Relief
Exhibit VV ....... John Zimmerman's testimony at Garrett's PCP hearing
Exhibit WW ..... James Cooper email to Jon Seaborg
Exhibit XX ....... Deposition of Kenneth Porter ("Porter Dep.")
Exhibit YY ....... David Miller's testimony at first criminal trial ("Miller TT1")
Exhibit ZZ ........ Affidavit of Dwight E. Scott
Exhibit AAA ..... Sandra Evans's testimony at first criminal trial
Exhibit BBB ..... Oddis Jenkins's testimony at second criminal trial
Exhibit CCC ..... Court Minutes and Judgment
Exhibit DDD .... Notice of Intent
Exhibit EEE ..... CRU Report (without exhibits)
Exhibit FFF .... Photographs of Lance's Burns
Exhibit GGG .... Photographs of Garrett's Burns
Exhibit HHH.... Deposition of Sunny Eaton ("Eaton Dep.")
Exhibit III ........ Lentini Report
Exhibit JJJ ...... Continued Deposition of John Zimmerman
Exhibit KKK .... Order Vacating Conviction
Exhibit LLL ..... Order Dismissing Charges
Exhibit MMM .. Deposition of Patrick Hunt ("Hunt Dep.")

Exhibit NNN.... Defendant U.S.A. Answers to Interrogatories
Exhibit OOO .... Defendant Cooper's Answers to Interrogatories
Exhibit PPP ..... Ruby Alcorn statement
Exhibit QQQ .... Bobby Alcorn statement
Exhibit RRR..... Bobby Alcorn testimony at Garrett's first trial
Exhibit SSS...... Michael Alcorn statement
Exhibit TTT ..... Colloquy re Mistrial
Exhibit UUU.... Continued Deposition of John Zimmerman