IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DEANA WATSON, as Independent Administrator of the Estate of CLAUDE GARRETT, Deceased,

Plaintiff,

v.

Current and/or Former ATF Agent JAMES COOPER, and THE UNITED STATES OF AMERICA,

Defendants.

Case No. 23–cv–00456

Honorable Eli Richardson, Judge Presiding.

Magistrate Judge Jefferey S. Frensley

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HER RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.01, Plaintiff Deana Watson, as Independent Administrator of the Estate of Claude Garrett, Deceased, respectfully submits her Response to Defendants' Statement of Undisputed Material Facts in Support of her Response in Opposition to Defendants' Motion for Summary Judgment.

1. In the early morning of February 24, 1992, a fire broke out at the residence of Claude Garrett and Lori Lance at 114 Broadway in Hermitage, Tennessee. The Nashville Metro Fire Department arrived and found Lori Lance in the utility room located in the rear of the home. Lori Lance died later of smoke inhalation. Exhibit 1, at DEF_RESP_PLTF_1ST_RPD_00002; *see also* Exhibit 2, at MG 000101.

**Response:** Admitted.

2. Prior to the fire, the Nashville Police Department had issued an incident report with allegations of domestic violence by Lorie Lance against Claude Garrett. Exhibit 3, Plaintiff's Responses to United States' First Set of Requests for Admission, at ¶ 1 (Feb. 7, 2024).

**Response:** Admitted for purposes of summary judgment only.

3. The night before the fire, Claude Garrett had spent five or six hours at a bar called Daisy Mae's and smoked marijuana. Exhibit 3, Plaintiff's Responses to United States' First Set of Requests for Admission, at ¶ 2 (Feb. 7, 2024).

**Response:** Admitted for purposes of summary judgment only.

4. Mr. Garrett told first responders who arrived on the scene that Ms. Lance was still in the house in the front bedroom. Exhibit 2, at MG 000112.

**Response:** Disputed. Patrick Hunt testified at Garrett's first trial that Garrett told him that "she was in the front of the house, and that they left the bedroom together and somehow they got separated and that's the last time he seen her, and she was in the front of the house." *See* Ex. PP, Hunt TT1, Zellner723:19–724:3.[1] During his interview with Detective Roland, Garrett stated, "Now when the firemen got there I kept telling him to go to the back of the house, for some reason I thought she'd go to the back of the house." Garrett further explained he thought that

---

[1] The exhibits cited by Plaintiff are attached to her memorandum of law filed in opposition to Defendants' motion for summary judgment.

she would go to the back of the house to get away from the fire. *See* Ex. T, Garrett Statement, MG67:13–19.

5. Firefighters did not find anyone in the front of the house, and when firefighter Patrick Hunt came outside to change an air tank, Mr. Garrett said that Ms. Lance was in the back of the house. Exhibit 2, at MG 000113; Exhibit 4, at MG 000083.

**Response:** Disputed.[2] The fact alleged by Defendants implies that Garrett told Hunt that he knew where Lance was located in the house. Hunt testified during his deposition that at the time of the fire he did not think that Garrett was telling him that he knew where Lance was located in the house. *See* Ex. MMM, Hunt Dep., 85:12–25. Hunt also testified that he did not view what Garrett said to him to be incriminating. *See* Ex. MMM, Hunt Dep., 90:5–10.

6. While Nashville firefighter captain Oddis Jenkins was in the house fighting the fire and attempting to save Ms. Lance, he messed with the door to the utility room, discovered it was locked, and it would not come open at first. Exhibit 5, Jenkins Dep. at 17:11-21, 21:15-22:12.

**Response:** Disputed. Jenkins told Detective Miller on the day of the fire that the door to the utility room was not locked. *See* Ex. A, Miller Report, DA2333. Jenkins's inability to describe how he opened the door, combined with the near zero-

[2] In their memorandum, Defendants rely on this assertion of fact to claim that Garrett told firefighters to look for Lance in the utility room. (Dkt. 141 at 17). This assertion is not only disputed, but demonstrably false. None of the firefighters have ever claimed that Garrett told them to look for Lance in the utility room.

visibility conditions under which he was working, render his testimony that the door was locked incredible and/or unreliable. *See* Ex. EEE, CRU Report, p. 45. Newly discovered video of a walk-through of the scene provides definitive visual evidence that the locking mechanism of the door was in the unlocked (or unlatched) position at the time of the fire. *See* Ex. III, Lentini Report, pp. 57–58.

7. Jenkins eventually found Ms. Lance on the floor of a utility room laying parallel to the wall, with her head and upper body between a washing machine and the wall with several items laying on top of her. Exhibit 5, Jenkins Dep. at 14:10-12; Exhibit 4, at MG 000084.

**Response:** Admitted for purposes of summary judgment only.

8. Firefighter Hunt could not find a pulse on Ms. Lance. Exhibit 4, at MG 000084.

**Response:** Admitted for purposes of summary judgment only.

9. Claude Garrett sustained only minor injuries, including burns to his forehead and the back of his hand, and singed hair. Exhibit 6, at MG 000047.

**Response:** Disputed. Detective Roland interviewed Ruby Alcorn at the scene, and she told him that Garrett appeared to have been burnt "pretty bad." *See* Roland Report, Ex. P, MG34. Garrett was diagnosed with and treated at the hospital for first and second degree burns, including second degree burns to the forehead, left biceps, and back of the left hand, as well as partial skin loss over the joints of the third, fourth, and fifth digits. *See* Ex. S, Garrett ER Records, Zellner183. Photographs of Garrett confirm that his burn injuries were similar, if not the same, in degree, to

those suffered by Lance. *See* Ex. EEE, CRU Report, MG8942–8943; *see* Ex. FFF, Photographs of Lance's Burns; *see* Ex. GGG, Photographs of Garrett's Burns.

10. Nashville Fire Department fire / arson investigator Kenneth Porter arrived on the scene at 6:30 a.m. that morning, began his inspection, collected samples that were sent to TBI, and noticed an unusual burn pattern suggesting to him a liquid accelerant. He also noticed a strong odor of kerosene and identified the fire's point of origin as the living room. He also observed an opaque, five-gallon plastic container on the kitchen floor next to the refrigerator and adjacent to the utility room door; the top of the container was partially melted and it contained kerosene. Exhibit 2, at MG 000114-115.

**Response:** Admitted for purposes of summary judgment only.

11. Mr. Porter was a certified fire investigator and had experience in arson investigations. Exhibit 7, Cooper Dep. at 13:6-8, 32:24-33:2.

**Response:** Admitted.

12. Firefighters assisted Mr. Porter in removing debris from the living room floor, and used a hose to wash the area, revealing what appeared to Mr. Porter to be a large pour pattern. The top portion of the aluminum storm door was burned off, indicating a very hot and fast-burning fire. Exhibit 2, at MG 000114-115.

**Response:** Admitted.

13. Detective David Miller arrived on the scene at 6:22 a.m., and when he and Detective Mike Roland arrived on the scene, the fire captain told them the fire was of a suspicious nature. Exhibit 6, at MG 000034, 48.

**Response:** Admitted.

14. Mr. Porter briefed Detective David Miller and Michael Roland that the fire may have been intentionally set, and Detective Miller requested that Mr. Porter gather all needed physical evidence. Exhibit 2, at MG 000114-115; Exhibit 8, Miller Dep., at 9:15-18, Exhibit 9, Roland Dep. at 126:20-127:8, 132:21-134:25.

**Response:** Admitted.

15. The detectives began interviewing neighbors and spoke with Lance's family members, who said that Lance's relationship with Garrett was fiery. Exhibit 6, at MG 000048.

**Response:** Admitted for purposes of summary judgment only.

16. Lance's family members and co-workers told detectives that Lance and Garrett regularly argued, that police had been called to their address multiple times, that Garrett became very mean when he was drunk, and that Garrett had once beaten Lance with a cord from a broken television set and in the same rage had thrown a Christmas tree into the front yard, producing bruises that lasted for days. Exhibit 6, at MG 000035, 41.

**Response:** Admitted for purposes of summary judgment only.

17. Detectives took an initial statement from Garrett, who appeared nervous and fidgety. Exhibit 10, at MG 000053; Exhibit 9, Roland Dep. at 95:2-6.

**Response:** Admitted that Roland described Garrett as "nervous and fidgety" for purposes of summary judgment only.

18. Garrett explained in a later interview that he and Lance had arrived home around midnight, had a good buzz, fell asleep, and moved to the bedroom. Eventually, Garrett said he woke up to the smell of smoke or the noise of the fire, shouted for Lance, grabbed her hand, and headed for the front door, but she broke away from him and headed to the back of the house. Garrett claimed he injured his hand breaking the front window. Exhibit 4, at MG 000059-65.

**Response:** Admitted.

19. After learning from Mr. Porter that the fire might have been intentionally set, detectives obtained a warrant to search the house for evidence. Exhibit 6, at MG 000047.

**Response:** Admitted.

20. Because Detectives Miller and Roland were not trained in arson investigations, they needed a fire investigator to determine whether the fire was accidental or intentional. Exhibit 8, Miller Dep. at 110:23-111:19; Exhibit 9, Roland Dep. at 207:16-22.

**Response:** Admitted, subject to and without waiving the following objection: the phrase "accidental" in this context is vague and ambiguous because it is unclear if it includes other fire determinations, including "natural" and/or "undetermined."

21. Detective Miller requested federal ATF Special Agent James Cooper come to the scene to assist in the collection of evidence. Exhibit 6, at MG 000046-47; Exhibit 7, Cooper Dep. at 9:19-20.

**Response:** Admitted.

22. On February 24, 1992, James Cooper was a Special Agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF"), and had assisted the Nashville Police Department with other arson investigations. Exhibit 7, Cooper Dep. at 8:7-15; 10:24-11:8.

**Response:** Admitted for purposes of summary judgment only.

23. Cooper's role at this time was as a certified fire investigator to provide assistance to state and local government officers and fire marshals through his training. Exhibit 7, Cooper Dep. at 12:18-23.

**Response:** Admitted for purposes of summary judgment only.

24. During his time at ATF, on average Mr. Cooper would assess twenty-five fires per month. Exhibit 7, Cooper Dep. at 192:9-23.

**Response:** Admitted for purposes of summary judgment only.

25. At 6:20 p.m. the day of the fire, Special Agent Cooper met Detectives Miller, Roland, and District Attorney's Office Investigator Regina West at the scene. Exhibit 6, at MG 000046.

**Response:** Admitted.

26. Special Agent Cooper determined the origin of the fire was the living room and the investigators observed that the electrical box had no internal damage and the kitchen stove burners were not burned out. Exhibit 6, at MG 000037-38; Exhibit 2, at MG 000101.

**Response:** Admitted.

27. The group observed that a wet bedspread that smelled of accelerant was in front of the refrigerator and had been stuffed partially under it. The group also observed that a clear plastic container was located between the refrigerator and the door to the utility room where Ms. Lance was found, and that it contained some kind of accelerant. Exhibit 6, at MG 000037.

**Response:** Disputed the group observed a wet bedspread that smelled of accelerant in front of the refrigerator stuffed partially under it. Porter, who walked through and investigated the scene prior to Cooper's investigation, did not document in his report that a bedspread that smelled of accelerant was located in front of the refrigerator. *See* Ex. D, Porter Report, MG114–25. Porter prepared a diagram of the scene, and the diagram does not include the bedspread. *See* Ex. H, Porter Diagram. Porter would have documented the bedspread had he observed it. *See* Ex. E, Porter TT2, Zellner14627:2–17. Metro Police Officer James Goodman also walked through the scene and prepared a diagram before Cooper's investigation. Goodman's diagram also did not include a depiction of the bedspread in front of the refrigerator. *See* Ex. I, Zellner14687:15–14689:22; *see* Ex. J, Goodman Diagram, Zellner13665. Goodman took photographs of the scene prior to Cooper's investigation, and a photograph of the refrigerator does not depict the bedspread lying in front of it. *See* Ex. K, Zellner25025–25026.

Admitted that the group observed a plastic container located between the refrigerator and the door to the utility room where Ms. Lance was found.

Admitted that that the container held some kind of accelerant for purposes of summary judgment only.

28. During the walk-through, Mr. Cooper recalled tripping over the bedspread, and asking one of the other investigators, "What is this?" Exhibit 7, Cooper Dep. at 26:17-27:1.

**<u>Response:</u>** Admitted that Cooper recalled tripping over the bedspread.

Admitted that Cooper asked one of the other investigators, "What is this?", for purposes of summary judgment only.

29. Agent Cooper examined the door of the utility room and observed that the inside of the door was clean, thus appearing that the door was in a closed position when the fire occurred. Exhibit 6, at MG 000037.

**<u>Response:</u>** Disputed. Cooper's report does not document that he examined the interior of the utility room door, and none of the photographs taken while he was at the scene depict the interior of the utility room door. *See* Ex. JJ, Cooper Report, MG101–102. Photographs of the door depict smoke deposits on the edge of the door, demonstrating that the door was not closed during the fire. *See* Ex. JJJ, Lentini 2016 Report, pp. 30–31

30. In the utility room, the group found a smoke detector laying on the front dryer with no batteries and no front face. Exhibit 6, at MG 000037.

**<u>Response:</u>** Admitted for purposes of summary judgment only.

31. Special Agent Cooper stated that the pour pattern was consistent with a liquid accelerant, and he collected a sample of the baseboard and floor debris. Exhibit 6, at MG 000038.

**Response:** Admitted that Cooper stated that the pour pattern was consistent with a liquid accelerant for purposes of summary judgment only.

Disputed that the burn pattern is consistent in appearance with the use of a liquid accelerant. *See*, *e.g.*, Ex. JJJ, Lentini 2016 Report, pp. 27–28.

Admitted that Cooper claimed to collect a sample of the baseboard and floor debris.

Disputed that the debris and cardboard remnants were located at or near the baseboard. The debris and cardboard is not depicted in a photograph of the west wall taken prior to Cooper's investigation at the location from which the sample was allegedly obtained. Ex. O, Photo of West Wall. The cardboard could not have withstood the temperatures reached in the living room at the time of the fire. *See* Ex. EEE, CRU Report, MG8921; Ex. III, Lentini Report, p. 51.

32. Detectives interviewed some neighbors of Garrett and Lance, the Alcorns. All three Alcorns noted Garrett did not appear to be trying hard to rescue Lance, and that Garrett had spent the following day after the fire at their house trying to determine what they knew about the fire. Exhibit 4, at MG 000076-81.

**Response:** Admitted that detectives interviewed some of Garrett's and Lance's neighbors.

Disputed that all three Alcorns noted Garrett did not appear to be trying hard to rescue Lance. Ruby Alcorn's statement indicates that during the time she returned to her house to call 911, her husband, son, and "Shorty" (Garrett) "were running around the house trying to get into windows that the fire was not coming through." Per the report, Ruby's statements were based on what she learned from others, not what she personally observed. *See* Ex. PPP, Ruby Alcorn Statement, MG76:17–MG77:1.

Admitted that Bobby Alcorn's statement indicates that "He [Garrett] was not trying very hard to rescue her [Lance]." However, Bobby Alcorn's statement also indicates that when he arrived at the scene of the fire, "Garrett was outside beating out windows." *See* Ex. QQQ, Bobby Alcorn Statement, MG79:10–13. Bobby Alcorn testified at Garrett's first criminal trial that Garrett "busted" out multiple windows, was calling for Lance, and chopped at a boarded up window with an axe. *See* Ex. RRR, Bobby Alcorn testimony at Garrett's first trial, Zellner602:8–605:8.

Admitted that Michael Alcorn's statement also indicates that "Shorty (Garrett) was outside beating on windows. . . . He didn't seem to be trying very hard to rescue her." *See* Ex. NNN, Michael Alcorn Statement, MG81:8–10.

The Alcorns' statements to detectives about whether they believed Garrett was "trying very hard to rescue" Lance are immaterial.

Disputed that all three Alcorns told detectives that Garrett had spent the following day after the fire at their house trying to determine what they knew about

the fire. Ruby Alcorn's statement does not include this information. *See* Ex. PPP, Ruby Alcorn Statement, MG76–78.

Admitted that both Bobby Alcorn's and Michael Alcorn's statements include nearly the exact same phrase to the effect that Garrett "asked a bunch of questions about what we saw and knew about the fire." *See* Ex. QQQ, Bobby Alcorn Statement, MG79:16–17; *see* Ex. SSS, Michael Alcorn Statement, MG81:12–13.

33. Garrett's clothing and evidence recovered from the scene were taken to the Tennessee Bureau of Investigation's laboratory for analysis. Exhibit 1, at DEFUSA_RESP_PLTF_1ST_RPD_00004; Exhibit 2, at MG 000115.

**Response:** Admitted for purposes of summary judgment only.

34. The police and TBI sent the kerosene heater recovered from the house to a professional consultant. Exhibit 6, at MG 000042-43.

**Response:** Admitted for purposes of summary judgment only.

35. Detective Miller presented the case to the grand jury on May 19, 1992, and the grand jury returned a true bill for first degree murder charges against Claude Garrett on May 29, 1992. Exhibit 6, at MG 000040.

**Response:** Admitted.

36. Claude Garrett was convicted of arson and murder in 1993 and 2003. Cooper's Answer, D.E. 58 at ¶¶ 116, 120; United States' Answer, D.E. 84 at ¶¶ 116, 120.

**Response:** Admitted for purposes of summary judgment only.

37. Claude Garrett's conviction was vacated on post-conviction by the Nashville District Attorney's Office's Conviction Review Unit. Exhibit 11, Eaton Dep. at 45:19-23, 47:9-21.

**<u>Response:</u>** Admitted for purposes of summary judgment only, subject to and without waiving the following objection: the CRU does not have the authority to vacate a conviction but, rather, must move for postconviction relief which may be granted or denied by the court. *See* Ex. HHH, Eaton Dep., 47:4–25.

38. James Cooper investigated the 1992 fire and testified at both trials of Claude Garrett. He was retired by the second trial and was subpoenaed to testify. Exhibit 7, Cooper Dep. at 25:8-10, 88:19-89:6; *see also* Exhibit 2, at MG 000101-02.

**<u>Response:</u>** Admitted for purposes of summary judgment only.

39. Director of the CRU Sunny Eaton represented the State during the proceeding vacating Claude Garrett's conviction. Ms. Eaton did not draw conclusions from her investigation about whether Mr. Cooper lied, was not trying to call anybody out for misconduct, did not recommend to District Attorney Glenn Funk that he come out and declare Claude Garrett innocent, could not conclusively say that Claude Garrett was innocent, was not aware of any evidence of a conspiracy by Cooper and the other defendants, was not aware of any evidence suggesting malicious prosecution, and was not aware of anyone planting evidence in the case. Exhibit 11, Eaton Dep. at 21:15-22, 157:13-22, 167:15-18, 170:3-12, 172:9-13, 173:1-7, 205:24-206:1.

__Response:__ Admitted for purposes of summary judgment only. These assertions of fact are immaterial.

40. Oddis Jenkins, who was 80 years old at the time of his deposition, did not know James Cooper and does not recall speaking with James Cooper. Exhibit 5, Jenkins Dep. at 9:19-20, 45:2-3, 50:6-10.

__Response:__ Admitted.

41. Kenneth Porter, who was 84 years old at the time of his deposition, did not remember working the Garrett case with Mr. Cooper, and did not recall being at the scene with Mr. Cooper. Exhibit 12, Porter Dep. at 8:15, 36:15-37:5.

__Response:__ Admitted.

42. Mr. Porter did not conspire to convict Claude Garrett, did not think at all about the case until this lawsuit came up, and did not know whether James Cooper conspired to convict Claude Garrett. Exhibit 12, Porter Dep. at 75:13-76:4.

__Response:__ Admitted for purposes of summary judgment only.

43. Desmond Carter, who was 84 years old at the time of the deposition, did not know James Cooper, and had not spoken to Mr. Cooper about anything. Exhibit 13, Carter Dep. at 9:5-6, 21:1-9.

__Response:__ Admitted.

44. Desmond Carter did not know Claude Garret and did not conspire with anyone else to frame him for arson and murder. Exhibit 13, Carter Dep. at 84:18-85:4.

__Response:__ Admitted for purposes of summary judgment only.

45. Oddis Jenkins did not know Claude Garrett and did not intend for Mr. Garrett to be charged with a crime. Exhibit 5, Jenkins Dep. at 76:11-13, 77:20-22.

__Response:__ Admitted that Oddis Jenkins did not know Claude Garrett.

Disputed that Oddis Jenkins did not intend for Claude Garrett to be charged with a crime. Oddis Jenkins initially told Detective Miller that the door was not locked or latched. *See* Ex. A, Miller Report, DA2333. Jenkins did not prepare an incident report or otherwise document that he found the utility room door locked, even though that was significant information. *See* Ex. W, Jenkins Dep., 28:6–24, 33:22–34:11. Jenkins later told ADAG Zimmerman that the door was locked, and he testified the door was locked at Garrett's trials. *See* Ex. TTT, Colloquy re Mistrial, Zellner791:22–792:3; *see* Ex. QQ, Jenkins TT1, Zellner770:25–771:6. The CRU found multiple reasons to discredit Jenkins's assertion that the door was locked, including his inability to describe what he did to open the door and the limited visibility at the time he encountered the door. *See* Ex. EEE, CRU Report, MG8939–8940. The newly discovered video of the walkthrough of the scene shows that the latch was in the open position at the time of the fire. *See* Ex. III, Lentini Report, pp. 57–58. This evidence from which a reasonable juror could conclude that Jenkins lied about the door being locked or latched to bolster the case against Garrett.

46. David Miller did not have any vendetta against Claude Garrett, did not conspire with anyone to frame Claude Garrett, did not see anyone tamper with evidence, or see anyone do anything unethical. Exhibit 8, Miller Dep. at 168:19-170:11.

**Response:** Disputed. Based on evidence that David Miller, along with Detective Michael Roland and James Cooper, conspired to fabricate evidence and frame Garrett for the murder of Lorie Lance, one can reasonably infer that Miller had a vendetta against Claude Garrett, conspired to frame Garrett, knew that evidence was tampered with, and observed other members of the conspiracy engage in "unethical" behavior.

Evidence supporting Plaintiff's assertion includes, but is not limited to: (a) photographic evidence showing that the bedspread was not located in front of the refrigerator before Cooper, Miller, and Roland performed their walkthrough of the scene (*see* Ex. K, Goodman Photograph of Refrigerator, Zellner25025–25026; *see* Ex. M, Photograph dated 3.5.92, DA2561–2573); (b) Porter's and Goodman's diagrams, which do not depict the bedspread in front of the refrigerator before the Cooper walkthrough (*see* Ex. H, Porter Diagram; *see* Ex. J, Goodman Diagram); (c) Miller and Roland's letter suggesting that Porter change his diagram before it was placed in the homicide file (*see* Ex. LL, Carter Letter, MG169–170; *see* Ex. MM, Carter Dep., 45:4–47:22); (d) Miller and Roland's failure to include the aforementioned letter in the homicide file (*see* Ex. NN, Zimmerman Dep., 32:14–33:19); (e) Miller's and Cooper's testimony at Garrett's trial suggesting that Cooper wore latex gloves, which he changed between handling evidence samples (*see* Ex. FF, Cooper TT1, Zellner895:16–20; *see* Ex. L, Miller TT2, Zellner3–14); (f) the revelation in this litigation that Cooper is allergic to latex, did not wear latex gloves, and that his hand is photographed at the scene wearing a non-disposable utility glove (*see* Ex. BB,

Cooper Dep., 76:8–25, 213:3–18, *see* Ex. OO, Photograph of Utility Glove, DA2520); (g) debris and cardboard was included in Cooper's baseboard sample which is not depicted in photographs of the scene taken prior to the Cooper walkthrough (*see* Ex. GG, Cooper TT2, Zellner14610:3–14611:20; *see* Ex. O, Photograph of West Wall); and (h) new evidence, consisting of a video walkthrough of the scene, shows that the lock to the utility room door was in the open position at the time of the fire (*see* Ex. III, Lentini Report, pp. 57–58).

Plaintiff provides a comprehensive list of additional facts with citations to the record supporting his claims of fabrication of evidence and conspiracy in her statement of additional material facts.

47. Michael Roland did not conspire to convict Claude Garrett of arson and murder, does not know if anyone else did, did not see anyone put the bedspread in the Garrett house, and was not invested in the outcome of the criminal case either way. Exhibit 9, Roland Dep. at 201:15-202:8, 211:13-212:24, 213:10-23.

**Response:** Disputed. Based on evidence that Michael Roland, along with Detective David Miller and James Cooper conspired to fabricate evidence and frame Garrett for the murder of Lorie Lance, one can reasonably infer that Roland conspired to convict Garrett of arson and murder and knew that the bedspread was planted in front of the refrigerator.

Evidence supporting Plaintiff's assertion includes the evidence cited in Plaintiff's response to Defendants' assertion of fact No. 46.

Plaintiff provides a comprehensive list of additional facts with citations to the record supporting his claims of fabrication of evidence and conspiracy in his statement of additional material facts.

48. Patrick Hunt had never heard of Claude Garrett or Lorie Lance before this fire, did not intend for Mr. Garrett to be charged with a crime, was not personally invested in the outcome of the case, and did not withhold evidence. Exhibit 14, Hunt Dep. at 136:1-141:4, 146:1-14.

**Response:** Admitted for purposes of summary judgment only.

49. Regina Beene (formerly known as West), who worked at the District Attorney's Office, was unaware of any conspiracy to frame Mr. Garrett for arson, did not observe anyone planting evidence at the scene, and testified that she was the one who found the bedspread in front of the refrigerator. Exhibit 15, Beene Dep. at 5:19-21, 90:22-92:21.

**Response:** Admitted that Regina Beene was unaware of any conspiracy to frame Garrett for arson and did not observe anyone planting evidence at the scene for purposes of summary judgment only.

Admitted that Beene testified that she was the one who found the bedspread in front of the refrigerator.

Disputed that Beene found the bedspread in front of the refrigerator. James Cooper testified that he tripped over the bedspread, which would make no sense if Beene had located and identified the bedspread as evidence prior thereto. *See* Ex. GG, Cooper TT2, Zellner14497:8–25, Zellner14527:3–18.

50. James Cooper never met or spoke with Claude Garrett and did not know Lorie Lance. Exhibit 7, Cooper Dep. at 196:12-18.

**Response:** Admitted.

51. James Cooper did not conspire with anyone to convict Claude Garrett, did not do anything illegal during the course of the investigation of this fire or after it, and did not observe anyone else do anything unconstitutional or illegal at any time during the course of this case. Exhibit 7, Cooper Dep. at 198:6-17.

**Response:** Disputed. Based on evidence that James Cooper, along with Detectives David Miller and Michael Roland, conspired to fabricate evidence and frame Garrett for the murder of Lorie Lance, one can reasonably infer that Cooper conspired to convict Garrett of arson and murder, that he engaged in illegal activity during the investigation, and violated Garrett's constitutional rights.

Evidence supporting Plaintiff's assertion includes the evidence cited in Plaintiff's response to Defendants' assertion of fact No. 46.

Additional evidence supporting Plaintiff's assertion includes evidence that Cooper committed perjury at Garrett's second trial by testifying that he interviewed Oddis Jenkins and Jenkins told him the door was "latched." *See* Ex. GG, CooperTT2, Zellner14510:3–19. The evidence overwhelmingly establishes that Cooper lied, which includes, but is not limited to: (a) Cooper's failure to indicate in his report any knowledge that the door was locked or that he interviewed any firemen (*see* Ex. JJ, Cooper Report, MG101–02); (b) Cooper's testimony at Garrett's first trial that he did not interview any firefighters because he "was just there to determine the cause and

origin of the fire;" (*see* Ex. FF, Cooper TT1, Zellner958:7–25); (c) Miller testified that none of the firemen came to the scene while Cooper was conducting his investigation (*see* Ex. L, Miller TT2, Zellner14356:15–24); and (d) Jenkins testified that he does not know who Cooper is and that he never spoke with an ATF agent at the scene (*see* Ex. W, Jenkins Dep., 45;2–9).

Additional evidence supporting Plaintiff's assertion includes the opinions stated in John Lentini's report, including but not limited to the following: (a) any investigator of Cooper's experience, training, and expertise would have known by the time of Garrett's second trial at the latest that irregular burn patterns are insufficient to conclude that a fire was started using an accelerant (*see* Ex. III, Lentini Report, pp. 6–13); (b) any investigator of Cooper's experience, training, and expertise would have known in 1992, based on the low flashpoint of kerosene, that the Garrett fire did not start by igniting kerosene poured on the floor of the residence (*see* Ex. III, Lentini Report, pp. 14–15); (c) any investigator of Cooper's experience, training, and expertise would have known in 1992 that Garrett's burn injuries were not caused by flashback from the ignition of kerosene vapors (*see* Ex. III, Lentini Report, pp. 16–22); (d) any investigator of Cooper's experience, training, and expertise would have known in 1992 that the bedspread and baseboard samples he collected were contaminated by the leaking kerosene container and the water hosed throughout the scene (*see* Ex. III, Lentini Report, pp. 23–29); and (e) any investigator of Cooper's experience, training, and expertise would have known in 1992 that he further

contaminated the samples he collected by handling them with the same gloves (*see* Ex. III, Lentini Report, pp. 33–36).

Plaintiff provides a comprehensive list of additional facts with citations to the record supporting his claims of fabrication of evidence and conspiracy in her statement of additional material facts.

52. James Cooper never planted evidence and never lied. Exhibit 7, Cooper Dep. at 58:8-16.

**Response:** Disputed. The evidence is that James Cooper planted evidence, lied to the prosecutor, and lied when he testified at Garrett's trial.

Evidence supporting Plaintiff's assertion includes the evidence cited in Plaintiff's response to Defendants' assertions of fact Nos. 46 and 51.

Additional evidence supporting Plaintiff's assertion includes the new video of the walkthrough of the scene taken on February 27, 1992, which was not disclosed to Garrett's defense attorneys and not discovered until this litigation. The video depicts the bedspread in Garrett's residence, in front of the refrigerator, as of February 27, 1992. *See* Ex. KK, Scene Video, 4:57–5:07. Cooper, however, testified at Garrett's criminal trial that because the bedspread was "dripping" with kerosene, they removed it from the house after obtaining a sample during his walkthrough of the scene on February 24, 1992. *See* Ex. FF, Cooper TT1, Zellner919:13–920:6

Plaintiff provides a comprehensive list of additional facts with citations to the record supporting his claims that Cooper lied to and/or misled both the prosecution and the jury in her statement of additional material facts.

53. James Cooper investigated over 200 fires during his career, but only one (this case) where a deceased victim was recovered from a locked room. Exhibit 7, Cooper Dep. at 84:4-85:3.

**Response:** Admitted that James Cooper investigated over 200 fires during his career.

Disputed that Lance was recovered from a locked room. Evidence supporting Plaintiff's assertion includes the evidence cited in Plaintiff's response to Defendants' assertion of fact No. 46.

54. Fire science has evolved significantly since 1992 and is continuously evolving. Exhibit 3, Plaintiff's Responses to United States' First Set of Requests for Admission, at ¶ 10 (Feb. 7, 2024).

**Response:** Admitted. This asserted fact is immaterial, because Plaintiff's claims are not based on Cooper's failure to anticipate evolutions in fire science, but rather are based on the status of fire science known to a fire investigator with Cooper's experience, training, and expertise in 1992.

55. Throughout his collateral attacks on his conviction, Claude Garrett alleged that James Cooper testified falsely before the jury in 2003 and misled the jury. Exhibit 16, Case No. 3:13-cv-190 (M.D. Tenn.), D.E. 26 at PageID# 5350 (Zellner 9726); *see also* Zellner 8797, 9728, 9878, 10473, 10480.

**Response:** Admitted.

56. In the order vacating Garrett's conviction, the post-conviction court found only that new scientific evidence proved that Agent Cooper's testimony was unreliable

and false – not that Agent Cooper lied to anyone about anything. Exhibit 17, Order Granting Post-Conviction Relief, Zellner 4095-4113.

**Response:** Admitted for purposes of summary judgment only.

57. On October 24, 2022, Claude Garrett filed his SF-95 with ATF. Exhibit 18, SF-95.

**Response:** Admitted.

58. Claude Garrett died in October 2022 after his release. Exhibit 19, Watson Dep. at 156:19-20, 188:3-5, 255:23-25.

**Response:** Admitted.

59. Plaintiff Deana Watson appeared on a television program called *Reasonable Doubt*. Exhibit 20, Plaintiff's Responses to United States' Second Set of Requests for Admission, at ¶ 1 (July 19, 2024).

**Response:** Admitted. This asserted fact is immaterial.

60. On *Reasonable Doubt*, Claude Garrett provided a phone interview to the show while incarcerated, described himself as a drinker and petty criminal prior to his incarceration, stated that he had consumed at least twelve beers and smoked marijuana the night of the fire, and described his relationship with Lorie Lee Lance as "fiery." Exhibit 20, Plaintiff's Responses to United States' Second Set of Requests for Admission, at ¶¶ 3, 4, 17, 23 (July 19, 2024).

**Response:** Admitted.

61. Plaintiff Deana Watson has no personal knowledge of whether Claude Garrett committed any crimes in February 1992 and has not conducted any

investigation into Claude Garrett's criminal case or this lawsuit apart from speaking with Garrett's attorneys. Exhibit 3, Plaintiff's Responses to United States' First Set of Requests for Admission, at ¶ 6 (Feb. 7, 2024); Exhibit 21, Plaintiff's Responses to United States' First Set of Interrogatories, at ¶ 6 (Feb. 7, 2024).

**Response:** Admitted.

Respectfully submitted:

Dated: July 2, 2025

/s/ Nicholas Curran
Nicholas Curran, IL Reg #6291493
One Attorney for Deana Watson
Kathleen T. Zellner & Associates, P.C.
2001 Butterfield Road, Suite 1025
Downers Grove, Illinois 60515
(630) 955-1212
nick@zellnerlawoffices.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2025, I filed the foregoing **Plaintiff's Response to Defendants' Statement of Undisputed Material Facts in Support of her Response in Opposition to Defendants' Motion for Summary Judgment** via the Court's electronic filing system, which will serve the following parties of record:

Anica C. Jones
Kimberly S. Viers
United States Attorney's Office
719 Church Street, Suite 3000
Nashville, TN 37203

Peter J. Strianse
Tune, Entrekin & White, P.C.
500 11th Avenue North, Suite 600
Nashville, TN 37203

/s/ Nicholas Curran
Nicholas Curran